[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 98-8899

_____

D.C. Docket No. 5:97-CV-79-4

FREDERICK LAMAR HARRIS,
DANNY CHADWICK, et. al.

Plaintiffs - Appellants,

versus

WAYNE GARNER, Commissioner of the
Georgia Department of Corrections,
A.G. THOMAS, Director of Facilities
Division of the Georgia Department of
Corrections, et. al.

Defendants - Appellees,

UNITED STATES OF AMERICA,

Intervenor-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(June 27, 2000)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

CARNES, Circuit Judge:

In an effort to stem the flood of prisoner lawsuits in federal court, Congress enacted the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA"). One of the provisions of the PLRA states that:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). We granted rehearing en banc in this case to decide whether the provision applies to lawsuits that are filed while the plaintiff is a confined prisoner but which are not decided until after he is released from confinement. We hold it does.

## I. BACKGROUND

The factual and legal background of this case is set forth in some detail in the panel opinion, Harris v. Garner, 190 F.3d 1279, vacated, reh'g granted en banc, 197 F.3d 1059 (11th Cir. 1999), and we will not repeat it at length here. Suffice it to say that eleven inmates of a Georgia prison filed a lawsuit claiming that their federal constitutional rights had been violated during a prison

2

"shakedown." All eleven of them were confined in the prison when the lawsuit was filed, but by the time the district court entered judgment fifteen-and-a-half months later six of the inmate plaintiffs had been released from confinement.[1] The district court nonetheless applied section 1997e(e) to bar those six prisoners' claims for monetary relief, because they had not alleged the requisite physical injury.

A panel of this Court reversed the district court's judgment insofar as it applied section 1997e(e) to the monetary claims of those six plaintiffs, see Harris, 190 F.3d at 1284-85, but we granted rehearing en banc, see Harris, 197 F.3d 1059 (11th Cir. 1999), which vacated the panel opinion. We now reinstate all of the panel opinion except for Part III A, which is the part that concerns this issue, and except for Part IV, the Conclusion, insofar as it relates to this issue. For the reasons that follow, we affirm the district court's judgment in part and vacate and remand it in part.

_____

[1] The lawsuit was filed on March 10, 1997, and judgment was entered on June 24, 1998. The six plaintiffs who were released from confinement during that interval are Danny Chadwick, Lenois Cook, William Dailey, Frederick Harris, Willie Hooks, and Farrell Nation. See Harris, 190 F.3d at 1283.The other five plaintiffs were still confined when judgment was entered in the district court but, according to the plaintiffs' brief, some of them have been released since then. All eleven of the plaintiffs are jointly represented in this appeal, but their counsel does not argue that any of those who were released *after* the date of the district court's judgment are, because of their release, free from the restrictions of section 1997e(e). Our references hereafter to "plaintiffs" are to those six who were released before the date of the district court's judgment, but the reasoning and holding of this opinion obviously apply as well to those who were released thereafter.

## II.  DISCUSSION

### A.  The Plain Language of the Statute

We begin our construction of section 1997e(e) where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision.  See United States v. Gilbert, 198 F.3d 1293, 1298 (11th Cir. 1999) (citing United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("In construing a statute we must begin, and often should end as well, with the language of the statute itself.") (citations omitted));  see also Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 - 54,  112 S.Ct. 1146,  1149 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others," which is  "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there;" and "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citations and marks omitted).

Insofar as the issue before us is concerned, the operative language of section 1997e(e)  is "No federal civil action may be brought by a prisoner confined . . . ," and the load- bearing word is "brought," a derivative of the verb "bring" in the third person singular,  passive voice.  The dispositive question is whether "bring"

means to commence or start a lawsuit, or instead means to maintain or continue it to conclusion.[2]

The standard legal dictionary answers that question as follows: "To 'bring' an action or suit has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit." Black's Law Dictionary 192 (6th ed. 1990); accord 5 Words and Phrases, "Begun" (1968) (defining 'begun" or "brought" to mean "commenced"). That is the generally accepted meaning of the term, and this is not the first time we have had occasion to say so. In EEOC v. Eastern Airlines, Inc., 736 F.2d 635, 639 (11th Cir. 1984), we were called upon to interpret section 7(c)(1) of the Age Discrimination in Employment Act, which provides that the right of any person "to bring" a private action under that statute terminates upon the commencement of an enforcement action by the EEOC. The defendant in the case argued that "to bring" means filing or continuing a lawsuit, so that once the EEOC starts an enforcement action, section 7(c)(1) bars a private plaintiff from continuing a previously filed lawsuit. See id. at 639. We rejected that position,

---

[2] The panel opinion focuses on the definition of "prisoner" in section 1997e(h): "the term 'prisoner' means any person incarcerated or detained in any facility ..." See 190 F.3d at 1294. But it matters not if we characterize the status question in terms of whether the plaintiff is a prisoner, or in terms of whether the plaintiff is confined. Under the PLRA a confined plaintiff is a prisoner, and a plaintiff who is not confined is not a prisoner. The question is whether section 1997e(e) covers a plaintiff who is a confined prisoner at the time the lawsuit is filed but who becomes a non-confined, former prisoner by the time judgment is entered. As we explain in the text, the answer lies in the plain meaning of the word "bring."

agreeing instead with the Second Circuit's decision in Burns v. Equitable Life Assurance Soc. of the U.S., 696 F.2d 21, 23 (2d Cir. 1982), that "the words 'to bring' mean only 'to commence,' rather than to 'commence or maintain.'" See EEOC, 736 F.3d at 639-40. The same is true here.

The Supreme Court has reached an identical conclusion about the meaning of "bring" and "brought." Hoffman v. Blaski, 363 U.S. 335, 341, 80 S. Ct. 1084, 1089 (1960), involved 28 U.S.C. § 1404(a), the venue provision which permits the transfer of "any civil action to any other district or division where it might have been brought." The argument was made that because the statute is remedial, the words "'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer." See id. at 342, 80 S. Ct. at 1089. The Supreme Court rejected that position, in large part because the statutory language was "unambiguous, direct [and] clear," id. at 343, 80 S.Ct. at 1089, and interpreting "might have been brought" to refer to anything other than the time the lawsuit was filed would "do violence to the plain words" of the statute. Id. at 344, 80 S.Ct. at 1090. The same is true here.

This is not new ground. The Supreme Court first broke it one hundred and seventeen years ago, when it had occasion to apply a legislative requirement that a

6

lawsuit be "brought within 90 days after the decision" of a government official. The Court said this:

> A suit is brought when in law it is commenced, and we see no significance in the fact that in the legislation of congress on the subject of limitations the word "commenced" is sometimes used, and at other times the word "brought." In this connection the two words evidently mean the same thing, and are used interchangeably.

Goldenberg v. Murphy, 108 U.S. 162, 163, 2 S. Ct. 388, 389 (1883). The same is true here: "brought" means "commenced."

The decisions we have laid out show that for more than a century before the enactment of the PLRA, it was well established that "brought" and "bring" refer to the filing or commencement of a lawsuit, not to its continuation. This long history of established meaning is important, because we readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense. See Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159, 113 S. Ct. 2006, 2011-12 (1993) (explaining that Congress is presumed to be aware of settled judicial and administrative interpretations of words when it writes them into a statute); Alabama v. Tennessee Valley Authority, 636 F.2d 1061, 1065 (5th Cir. 1981) ("When a word has a judicially settled meaning, it is presumed that Congress, by using that word in a statute, used it in that accepted sense.") (citation omitted).

7

The meaning that we give section 1997e(e)'s "may be brought" – the plain and ordinary meaning of the words – is also mandated by our recent decision about the meaning of "shall be brought" as that phrase is used in another section of the same legislation. Congress included in the PLRA an administrative exhaustion requirement which provides that "No action shall be brought with respect to prison conditions ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). In Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999), we interpreted the word "brought" in section 1997e(a) to mean the filing of the lawsuit, holding: "An inmate incarcerated in a state prison, thus, must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under section 1983." (emphasis added). Indeed, the panel opinion in this case agrees with that interpretation. See Harris, 190 F.3d at 1286 (holding that the "brought" language in section 1997e(a) "means that a prisoner must exhaust all administrative remedies that are available before filing suit . . . .") (emphasis added).

The language we have quoted from the Miller decision establishes that "brought," as used in section 1997e(a)'s "No action shall be brought ..." language means filed. And the same word means the same thing in section 1997e(a)'s "No federal civil action shall be brought ..." language. See Atlantic Cleaners & Dyers,

8

Inc. v. United States, 286 U.S. 427, 433, 52 S. Ct. 607, 609 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."); Doctors Hosp., Inc. of Plantation v. Bowen, 811 F.2d 1448, 1452 (11th Cir. 1987) ("A presumption is made that the same words used in different parts of an act have the same meaning.").

Our interpretation of section 1997e(e) is also consistent with the decisions of other courts of appeal which have interpreted that and similarly worded other provisions of the PLRA. In Kerr v. Puckett, 138 F.3d 321, 322-23 (7th Cir. 1998), the Seventh Circuit held that application of the section 1997e(e) bar depends on the confinement status of the plaintiff at the time the lawsuit was commenced. The Kerr case involved a prisoner who was no longer confined at the time he filed the lawsuit, having already been released on parole. Based on the plain language of the statute, the Seventh Circuit concluded that Congress intended to exclude the possibility "that 'prisoner' refers to the plaintiff's status at the time of the injury rather than at the time the litigation begins." Id. at 323. The Court held section 1997e(e) did not apply, because "Kerr brought the suit after he had been released on parole and was therefore no longer 'confined in a jail, prison, or other correctional facility.'" Id. at 322. Only because Kerr was not confined at the time

9

he filed his lawsuit did the Seventh Circuit hold that section 1997e(e) did not apply.

Under the reasoning in <u>Kerr</u>, the Seventh Circuit would reach the opposite result, and the same one we do here, where the plaintiff was confined when he filed the lawsuit. It is confinement status at the time the lawsuit is "brought," i.e., filed, that matters. The same rule of decision has been applied by the other circuits that have had occasion to speak to the issue. See <u>Greig v. Goord</u>, 169 F.3d 165, 167 (2d Cir. 1999) ("Appellees acknowledge that Greig was a parolee <u>at the time he filed his complaint</u> . . . .") (emphasis added); <u>Doe v. Washington County</u>, 150 F.3d 920, 924 (8th Cir. 1998) ("<u>When he filed this complaint</u>, Doe was neither incarcerated nor detained in any jail, prison, or correctional facility.") (emphasis added). Plaintiffs have been unable to cite a single decision of any district court or court of appeals holding that section 1997e(e) turns upon the confinement status of the plaintiff at any time other than the time the lawsuit is filed.

Not only is our conclusion about the meaning of "brought" reinforced by the decisions of the other circuits that have interpreted section 1997e(e), it is also consistent with decisions of the circuits that have interpreted "brought" and "bring" as those words are used in other provisions of the PLRA. Several of those decisions concern the PLRA's "three strikes" section. That section, codified as 28

U.S.C. § 1915(g), provides that a prisoner may not "bring a civil action or appeal" in forma pauperis if he has on three or more occasions brought an action or appeal that was dismissed on grounds it was frivolous, malicious, or failed to state a claim, unless the prisoner is under imminent danger of serious physical injury.

The words "bring a civil action or appeal" in section 1915(g) have been held to mean the filing of a suit or appeal, not its continuation. See Chandler v. D.C. Dept. of Corrections, 145 F.3d 1355, 1359 (D.C. Cir. 1998). ("[W]e hold that the phrase 'appeal a judgment' in subsection (g) refers to the initiation of an appeal," and "the phrase 'bring a civil action' means to initiate a suit."); Banos v. O'Guin, 144 F.3d 883, 885 (5th Cir. 1998) ("In order to implement this statutory scheme, we must determine if danger exists at the time the plaintiff seeks to file his complaint or notice of appeal IFP.") (emphasis in original); Ashley v. Dilworth, 147 F.3d 715, 717 (8th Cir. 1998) ("As the statute's use of the present tense verbs "bring" and "is" demonstrates, an otherwise ineligible prisoner is only eligible to proceed IFP if he is in imminent danger at the time of filing.") (emphasis in original); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1025 (7th Cir. 1996) (holding that section 1915(g) "governs bringing new actions or filing new appeals – the events that trigger an obligation to pay a docket fee – rather than the disposition of existing cases").

11

Decisions interpreting 28 U.S.C. §1915(b)(1), the PLRA's full payment provision, are also relevant. That section states: "if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee." 42 U.S.C. § 1915(b)(1). Two of the three circuits which have interpreted that "bring" language have held it means the provision applies to prisoners who were confined when they filed a notice of appeal even though they were released before their appeal was decided. In Gay v. Texas Dept. of Corrections State Jail Div., 117 F.3d 240, 242 (5th Cir. 1997), the Fifth Circuit, "[b]ased on the plain language of § 1915(b)(1)" and that Court's "desire to put some teeth into the PLRA's front-end deterrent," held that the filing fee requirement applied to a former prisoner, because when he filed an appeal he was confined, even though he was released before his appeal was decided. That he "was released from prison after he filed his notice of appeal is irrelevant," the Fifth Circuit concluded. Id. The Seventh Circuit reached the same conclusion in Robbins v. Switzer, 104 F.3d 895, 897-98 (7th Cir. 1997) ("Robbins was a prisoner when he filed . . ., and therefore is obligated to pay. His current status does not alter the fact that he was a prisoner when he filed the appeals."). But see McGann v. Comm'r, Social Security Administration, 96 F.3d 28 (2d Cir. 1996) (reaching the opposite conclusion); see also id. at 30-31 (Miner, J., dissenting) ("My dissent

12

is compelled by the simple and familiar principle that when the language of a statue is plain and enacted within the constitutional authority of Congress, as it is here, the sole function of the courts is to enforce it according to its terms.") (internal marks and citation omitted).

In expressing its intent about which civil actions section 1997e(e) bars, Congress said it bars those federal civil actions "brought by a prisoner confined," not those continued by, or litigated to judgment by a prisoner confined. <u>Cf.</u>, <u>W.J. Lake & Company, Inc. v. King County</u>, 104 P.2d 599 (Wash. 1940) (interpreting the statutory phrase "the court before whom such action is brought" and holding: "The statute cannot be extended beyond its plain terms. Had the word 'pending' been used, instead of brought, a different question would be presented. This action was not 'brought' before this court.") The plaintiffs and the dissenting opinion, in effect, ask us to rewrite the clear and unequivocal language Congress used, so that it will read: "No federal civil action may be brought by a prisoner confined . . . <u>except if he is no longer confined at the time judgment is entered in the case</u>." (emphasized language added). That is exactly how the provision would read if it meant what they say it does. If Congress had wanted to weaken the section 1997e(e) bar by adding that exception, it easily could have done so. We will not do to the statutory language what Congress did not do with it, because the role of

13

the judicial branch is to apply statutory language, not to rewrite it. See <u>Badaracco</u> <u>v. Commissioner</u>, 464 U.S. 386, 398, 104 S. Ct. 756, 764 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); <u>Blount v. Rizzi</u>, 400 U.S. 410, 419, 91 S.Ct. 423, 429 (1971) ("it is for Congress, not this Court, to rewrite the statute"); <u>Korman v. HBC Florida,</u> <u>Inc.</u>, 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes.").[3]

## B. The Congressional History

When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language. See <u>United States v.</u> <u>Gonzales</u>, 117 S.Ct. 1032, 1035 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); <u>Ratzlaf v. United</u> <u>States</u>, 510 U.S. 135, 147-48, 114 S. Ct. 655, 662 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear."); <u>Barnhill v.</u> <u>Johnson</u>, 503 U.S. 393, 401, 112 S.Ct. 1386, 1391(1992) ("To begin, we note that

---

[3] The dissenting opinion labels our interpretation of the plain language of section 1997e(e) "judicial activism," a label which would more aptly apply to an interpretative approach that writes language into a statute. Our interpretation neither adds anything to nor subtracts anything from the statutory language.

14

appeals to statutory history are well taken only to resolve statutory ambiguity."); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("Where the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said.").

Notwithstanding that well-recognized and bedrock principle, sometimes judges who find that legislative history supports and complements the plain meaning of statutory language cannot resist the temptation to set out that history. We have given in to that temptation more than once. See, e.g., United States v. Gilbert, 198 F.3d 1293, 1299 (11th Cir. 1999) ("Given the plain meaning of the statutory language, we could bypass any consideration of legislative history. Nevertheless, for the sake of completeness, and because this is our first occasion to decide a Hyde Amendment case, we will look at that history.") (internal marks and citations omitted). We find the temptation to set out the legislative history of the PLRA irresistible – even though the plain meaning of the statutory language in section 1997e(e) makes it irrelevant – because we want to correct what we believe is a misreading or misapplication of that legislative history in the panel opinion, see Harris, 190 F.3d at 1284-85, and in the dissenting opinion.[4]

---

[4] The dissenting opinion takes us to task  for discussing the legislative history as it reflects the  clear Congressional purpose behind section 1997e(e), and charges that it is

15

The panel opinion says that "Congress manifestly wanted to draw a bright line distinction between those who are prisoners, and those who are not prisoners." Id. at 1284-85. That statement is true as far as it goes, of course, but the question is when did Congress want a plaintiff's status as a prisoner or non-prisoner to be determined for purposes of the PLRA's restrictive provisions. The legislative history of the PLRA shows that Congress was concerned with the number of prisoner cases being <u>filed</u>, and its intent behind the legislation was to reduce the number cases <u>filed</u>, which is why Congress made confinement status at the time of <u>filing</u> the decisive factor.

Congress' concern and intent is reflected in the floor statements of Senators Dole and Kyl, two of the principal architects of the PLRA.[5] Their statements

_____

inconsistent for us to point out that the legislative history reinforces our conclusion about the plain meaning of the statutory language. <u>See</u> Dissenting Op. at 65 - 67. So long as legislative history is not used to contradict the plain meaning of the statutory language, we see no inconsistency in pointing out that both the statutory language and legislative history lead to the same interpretative result. Besides, if there were any inconsistency in relying upon both the statutory language and legislative history, the panel opinion would not have done it, <u>see</u> 190 F.3d at 1284 - 85, nor would the dissenting opinion do it, <u>see</u> Dissenting Op. at 62 - 64, 69 - 72.

[5] The evolution of the legislative language itself provides little guidance. In its original form, the provision that would become section 1997e(e) limited recovery in civil actions brought "by an adult convicted of a crime confined in a jail, prison, or other correctional facility." S. 866, 104th Cong. 1st Sess. § 7A (1995). The remarks during floor debate are more important than usual, as this Court has explained: "[B]ecause Congress enacted [the] PLRA as a rider to an appropriations bill, floor debate is more indicative of legislative intent than it otherwise would be, especially where the floor statements in favor of the bill remain uncontested." <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1325 n.8 (11th Cir. 1998) (internal marks and citations omitted). The statements of Senators Dole and Kyl are due special consideration, because they, along with Senators Hatch, Hutchison, and Abraham, were the architects of the PLRA. <u>See</u> 142 Cong. Rec. S3703-01, S3704 (daily ed. April 19, 1996).

reveal that it was the filing of the prisoner lawsuits that Congress viewed as a problem and set about to solve. See 141 Cong. Rec. S14408-01, S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole) (explaining that the number of prisoner suits filed "has grown astronomically – from 6,600 in 1975 to more than 39,000 in 1994."); 141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("Frivolous lawsuits <u>filed</u> by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population.") (emphasis added); 141Cong. Rec. S14408-01, S14418 (daily ed. Sept. 27, 1995) (statement of Sen. Kyl) ("Today's system seems to encourage prisoners to <u>file</u> with impunity.") (emphasis added).

Confined prisoners have little to lose by filing frivolous lawsuits, and that is why Congress made the confinement status of the plaintiff at the time a lawsuit is filed the controlling factor. See 141 Cong. Rec. S7498-01, S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) ("<u>Filing</u> frivolous civil rights lawsuits has become a recreational activity for long-term residents of our prisons.") (emphasis added); 141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("[P]risoners will now 'litigate at the drop of a hat,' simply because they have little to lose and everything to gain." (quoting Chief Justice Rehnquist)).

As the Seventh Circuit has explained, "Congress deemed prisoners to be pestiferous litigants because they have so much free time on their hands and there are few costs to filing suit." Kerr v. Puckett, 138 F.3d at 323. The distinction between current and former prisoners makes sense for that reason, and because "[o]pportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits." Id.; see also Madrid v. Gomez, 190 F.3d 990, 996 (9th Cir. 1999) ("[I]t is certainly conceivable that, because of significant potential gains and low opportunity costs, prisoners generally file a disproportionate number of frivolous suits as compared to the population as a whole."); Tucker v. Branker, 142 F.3d 1294, 1301 (D.C. Cir. 1998) (noting that "prisoners have a lower opportunity cost for their time than other indigent (and in all likelihood, non-indigent) litigants").

Congress made confinement status at the time of filing the criterion, because that is the point at which the difference in opportunity costs was causing the problem Congress was trying to solve: the large number of filings. See generally Christiansen v. Clarke, 147 F.3d 655, 658 (8th Cir. 1998) ("Because prisoners, even under the PLRA, initially pay a reduced filing fee (they receive, in effect, an interest free loan to pay the full filing fee), see 28 U.S.C. § 1915(b), and because prisoners have excessive amounts of free time on their hands, they are more likely

18

than paying plaintiffs to <u>file</u> meritless suits.") (emphasis added). Given the legislation's overriding goal of reducing the number of prisoner cases filed, it would have made little or no sense for Congress to have made confinement status at any time after filing determinative.

In considering why Congress chose to peg the application of section 1997e(e) on confinement status at the time of filing, it is worth mentioning that confinement status can change several times during the course of the months or years it takes the overburdened district courts to enter judgment in a case. Consider this hypothetical and how episodic the application of section 1997e(e) would be if post-filing confinement status were the criterion: A plaintiff is confined when he files the lawsuit (the section applies); shortly thereafter he is released on parole (the section no longer applies); later he is picked up and jailed on a parole violation charge (the section applies again); he bails out after a few days (the section no longer applies); but after a hearing his parole is revoked, and he is returned to prison (the section applies again).[6] No one has yet explained to us

---

[6] The dissenting opinion at 85 n.18 dismisses our hypothetical as "somewhat exotic." To the contrary, the latest information shows that more than 694,000 prisoners are on parole in this country. See Thomas P. Bonczar & Lauren E. Glaze, U.S. Dept. of Justice, <u>Probation and Parole in the United States, 1998</u> 5 (1999). Many are arrested and incarcerated for parole violations, then make bail, and so forth. Indeed, in the latest year for which statistics are available, over 155,000 of the nation's state prisoners were parole violators. See Robyn L. Cohen, U.S. Dept. of Justice, <u>Probation and Parole Violators in State Prisons, 1991</u> 2 (1995). Although no bail statistics are available, for those 155,000 potential plaintiffs there was at least initial incarceration, release from incarceration, and return to incarceration.

why Congress would have wanted the application of an important provision, such as  section 1997e(e), to be such an on-again, off-again thing.

Last year alone, there were 3,465 prisoner lawsuits filed in the district courts of this circuit.  See Admin. Office of the U.S. Courts, Statistical Tables for the Federal Judiciary, Table C-3, 34-35 (for the twelve-month period ending June 30, 1999).[7]  As this case illustrates, it often takes more than a year after filing for judgment to be entered by the district court in such a case.  The best figures available indicate that more than 47,000 state and federal prisoners were released

---

Thus, our parole violation hypothetical describes a situation occurring with far greater frequency than the "even worse scenario"  upon which the dissent relies: a scenario where a prisoner has filed a claim for monetary damages, has gotten past a motion to dismiss on the physical injury requirement, has gotten past summary judgment on that issue, and goes to trial on that issue but is released before judgment is entered against him on it.  See Dissenting Op. at 86 - 87. If the inmate is not released until after judgment is entered against him on the physical injury issue then the dissent's scenario is not a  criticism of our interpretation of § 1997e(e), because everyone (including the dissent) agrees that § 1997e(e) applies with full force where judgment is entered before the release, even if  by only  a day. Moreover, the criticism the dissenting opinion attempts to mount through use of its scenarios would not apply even where the inmate was released before judgment,  unless the inmate had not suffered any physical injury. All agree that the § 1997e(e) bar has no application at all where there is physical injury. The only cases that fit the dissent's "even worse scenario" are those in which the plaintiff has not suffered any physical injury but nonetheless makes it past a motion to dismiss on that issue, then makes it past a summary judgment motion on that issue, then loses  at trial on that issue, but is released before judgment is entered. That is truly a "somewhat exotic" hypothetical.

[7] The statistic we cite does not include 28 U.S.C. §§  2241, 2254, and 2255 filings, because they are not covered by the PLRA. See Anderson v. Singletary, 111 F.3d 801, 805 (11th Cir. 1997) ("Congress promulgated the PLRA to curtail prisoner tort, civil rights and conditions litigation, not the filing of habeas corpus petitions.")

20

from confinement in this circuit in the most recent twelve-month period.[8]  Many of the tens of thousands of prisoners who are released from confinement each year in this circuit alone  undoubtedly have federal lawsuits pending at the time of their release.  The magnitude of the problem illustrates the wisdom of Congress' deliberate decision to draw the confinement line – with plain and unequivocal language –  where it did in section 1997e(e), which is at the point of filing.  We have no authority to move that line.[9]

---

[8] The state corrections departments and the Federal Bureau of Prisons have different reporting years, but using the most recently completed reporting year for each,  the figures are as follows:  8,421 state prisoners were released from confinement in Alabama, see Alabama Dep't of Corrections, Monthly Reports (Oct. 1998 - Sept. 1999 data); 15,213 state prisoners were released from confinement in Georgia, see Georgia Dep't of Corrections, Inmate Statistical Profile – Prison Departures (1998); 23,025 state prisoners were released from confinement in Florida, see Florida Dep't of Corrections, Inmate Releases, Annual Report (1999); and 1,508 inmates were released from confinement in federal prisons in this circuit in calendar year 1999 (federal release figures obtained from the Southeast Regional Office of the Federal Bureau of Prisons).

[9] The dissenting opinion constructs elaborate, multi-premised scenarios  in an effort to show how its approach would yield  better policy results than the one we think Congress embodied in section 1997e(e).  See Dissenting Op. Part III at 82 - 88.  There are many flaws to the reasoning underlying the dissent's scenarios.  To begin with, one of its essential factual premises is that a substantial number of prisoners who file complaints that fall within the scope of the provision will make it past a motion to dismiss, and past summary judgment to trial on the physical injury issue.  Not only that, but the dissent posits that they will be released before judgment is entered.  See Dissenting Op. at 83. That sounds to us like an unlikely scenario. See supra, at 19 n.6.  The dissent cannot point to anything in this record or elsewhere that indicates those facts are likely to occur with any regularity.  Those facts do not represent the typical case, or this case, either.  These six plaintiffs were all released before the magistrate judge had even made any recommendation on the Rule 12(b)(6) motion to dismiss the complaint under section 1997e(e).  Nor is there any apparent basis for the dissent's assumption that in the typical case a substantial amount of effort  will be invested in determining whether the plaintiff has suffered physical injury.  Here, that question  was decided in a motion to dismiss, and even if the case had gone to summary judgment, there is no reason to believe that much effort would have been required to determine whether there was a triable issue of physical injury.

21

Because section 1997e(e) applies only to claims filed while an inmate is confined, it does not prevent a former prisoner from filing after release a monetary damages claim for mental and emotional injury suffered while confined, without a prior showing of physical injury. Accordingly, dismissal under this statutory provision of a claim that is filed during confinement should be without prejudice to re-filing the claim if and when the plaintiff is released. See <u>Zehner v. Trigg</u>, 952

---

A second problem with the dissent's reasoning relating to the scenarios it puts forward is that the very same reasoning argues just as strongly against application of section 1997e(e) in situations to which the provision indisputably does apply. All the effort the dissent's scenarios posit also will have been spent in those cases in which the claim for monetary relief is held to be barred under section 1997e(e) in a judgment entered <u>before</u> the inmate plaintiff is released. Yet, no one disputes that if the judgment is entered before the plaintiff is released, section 1997e(e) applies with full force, and that is true even if the release happens just after judgment or while the case is on appeal. See supra, at 3 n.1. Yet, according to the dissent's reasoning, all of that adjudication of the physical injury issue will have been a total waste, <u>see</u> Dissenting Op. at 38 ("the awful burden"), because it predicts the case will be re-filed after the plaintiff's release and the monetary damages claim will have to be re-litigated free of the physical injury requirement of section 1997e(e). <u>See</u> Dissenting Op. at 84 ("All of the court's work in determining whether the plaintiff suffered physical injury will have been for naught, because physical injury will no longer be an element of the plaintiff's claim."). Thus, it appears that the dissenting opinion's stated policy disagreement applies equally to any application of section 1997e(e).

A third defect with the dissent's posited scenarios and reasoning is that its fundamental premise is at war with the congressional premise behind section 1997e(e). The dissent's scenarios assume, without any basis, that all or most plaintiffs who file complaints while incarcerated and have them dismissed under section 1997e(e) will re-file those complaints after they are released. That is the only way that there will be the duplication of effort and "the awful burden" on the system the dissent fears. Yet, as we all agree, the congressional judgment behind section 1997e(e) is that because of a difference in opportunity costs, a released inmate is far less likely to file a lawsuit than an incarcerated inmate. <u>See Harris</u>, 190 F.3d at 1284 -85; supra, at 16 -19; Dissenting Op. at 69 - 71. The dissenting opinion's scenarios and the assumptions underlying them reveal that the dissent's disagreement with our position is actually a disagreement with what we believe to be the policy decisions and attendant judgments Congress made in enacting section 1997e(e).

F.Supp. 1318, 1335 (S.D. Ind. 1997) (dismissal without prejudice of section

1997e(e) barred claim), aff'd, 133 F.3d 459 (7th Cir. 1997). Some, but not all,

claims will be re-filed after the plaintiff is released, and more total effort may well

be required to adjudicate those particular claims that are re-filed than if the section

1997e(e) bar did not exist. But the provision reflects Congress' belief that because

of the difference in opportunity costs, a substantial number of such claims will not

be re-filed after release and that will result in a significant net savings to the

judicial system. That is the judgment Congress made about what the difference in

opportunity costs between inmates and former inmates would mean, and it is the

judgment underlying section 1997e(e).

### C. The Purported Amendment or Supplement

The panel opinion says that after these six plaintiffs were released, and

before the district court entered judgment against them, the court permitted them to

amend the complaint to indicate their new status as former prisoners. That,

according to the panel opinion, makes all the difference and allows these plaintiffs

to escape the section 1997e(e) bar. See Harris, 190 F.3d at 1284. We are not

entirely convinced that the complaint was actually amended in that or any other

way.[10] The panel opinion had no doubt there was an amendment. Now, the

---

[10] No motion to amend the complaint was filed, and neither the magistrate judge nor the district court said the complaint had been amended. The plaintiffs did file a motion to withdraw

23

dissenting opinion says it there is no doubt that there was not an amendment, but a supplement. It appears that the requirements of Rule 15(d) were not met.[11] But we are convinced that any such amendment or supplement is irrelevant to the application of section 1997e(e), and so we will assume for purposes of discussion that before judgment was entered against the plaintiffs the complaint was amended or supplemented to reflect that they had been released from confinement after they filed the lawsuit.

The reason such an amendment or supplement makes no difference is that, for all of the reasons we have already discussed, the confinement status of the

their request for injunctive relief, which simply acknowledged that there was no longer any need for an injunction in view of their release. But the court did not formally rule on that motion. Instead, the magistrate judge (whose recommendations were adopted by the district court without relevant change) concluded: "These plaintiffs cannot obtain monetary relief because they alleged only mental or emotional injuries and their injunctive claims are moot since they have been released from prison." [R&R at 5]. The claims were dismissed with prejudice.

[11] The rule provides that a supplement to the pleadings may be permitted "[u]pon motion of a party." Fed. R. Civ. P. 15(d). There was no motion to supplement the pleadings. The rule also says that the court may permit a supplement "upon reasonable notice." Id. We can hardly say that the defendants had reasonable notice that a supplement to the pleadings was being considered when the first time it occurred to anyone that it was a Rule 15(d) supplement to the pleadings is when the case reached the en banc stage of appeal. The thought that a Rule 15(d) supplement was involved apparently never occurred to the parties in the district court, to the district judge, or to the panel judges. The rule also charges the district court with conditioning permission to supplement the pleadings upon "such terms as are just." Id.; see also Fed. R.. Civ. P. 15(d) advisory committee note ("As in other situations where a supplemental pleading is offered, the court is to determine in the light of the particular circumstances whether filing should be permitted, and if so, upon what terms.") The district court did not do what the rule requires a court to do before permitting a supplemental pleading, apparently because the court was not aware that it was being requested to permit a supplement to the pleadings.

plaintiffs at any time after the lawsuit is filed is beside the point. The status that counts, and the only status that counts, for purposes of section 1997e(e) is whether the plaintiff was a "prisoner confined in a jail, prison, or other correctional facility" at the time the federal civil action was "brought," i.e., when it was filed. It is an undisputed historical fact that all of these plaintiffs were confined in a Georgia prison or correctional facility at the time their complaint was filed. No amendment or supplement to a pleading can change a historical fact, and the one in question did not purport to do so. The amendment or supplement did not deny that these six plaintiffs had been confined prisoners at the time the lawsuit was filed. All it noted was that they had been released since the lawsuit was filed which, of course, means that they were no longer "prisoner[s] confined." But that change in their status after the lawsuit was filed is irrelevant under section 1997e(e).

As we have discussed, the intent of Congress behind section 1997e(e) was to reduce the number of prisoner lawsuits <u>filed</u>, and specifically to reduce the number that are <u>filed</u> because the opportunity costs of <u>filing</u> a lawsuit are lower for an incarcerated plaintiff than for one in the free world. The opportunity costs of <u>filing</u> a lawsuit do not change after it has been <u>filed</u>. That is why the release of an inmate after he has <u>filed</u> a lawsuit is irrelevant for purposes of section 1997e(e).[12]

_____

[12] The opening and penultimate paragraphs of the dissenting opinion characterize our holding as being that the district court properly dismissed the complaint under section 1997e(e)

25

The opposing position essentially treats section 1997e(e) as if Congress had been concerned not with the opportunity costs of filing a lawsuit, but instead with the opportunity costs of continuing an already filed lawsuit. Only if that were true would an amendment or supplement noting that the plaintiff had been released after filing the lawsuit make any difference. But most of the damage to the overburdened system is already done, or put in motion, after the lawsuit is filed. That is why Congress made the operative fact the plaintiff's status at the time of filing, not status at the time the lawsuit is decided. We know Congress did that, because it said: "No federal civil action may be <u>brought</u> by a prisoner confined ..." (emphasis added), and as we have explained "brought" means filed; it does not mean continued or maintained after filing. Congress chose its words and we will heed them.

The difference between our position and that of the dissenting opinion is crystalized in its proposition that a prisoner who files his claim in direct contravention of section 1997e(e) while he is incarcerated ought to be allowed to

"even though that section no longer applies to plaintiffs because they are no longer prisoners within the meaning of the Act," Dissenting Op. at 37 & 90. Of course anyone would dissent from a holding that a statute was properly applied to cases to which it no longer applies. That is not what we hold. Instead, as explained in the text above, we hold that because these plaintiffs were incarcerated at the time they filed their complaint, section 1997e(e) applies to them even though they were later released before any judgment was entered in the case. Or to put it in the same terms the dissenting opinion uses, we hold that the district court properly dismissed the complaint because section 1997e(e) does apply to it.

26

continue with that claim after release, because "[p]risoners who are released while their suit is still pending immediately begin to face the same opportunity costs of prosecuting their action as everyone else." Dissenting Op. at 71-72. Congress could have written the statute to focus on the opportunity costs of prosecuting actions, but it did not. Instead, Congress aimed at the opportunity cost of filing actions. That is clear in the language Congress used to express its will ("brought," not "prosecuted" or "continued"), and in the legislative history, see 141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("Frivolous lawsuits filed by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population.") (emphasis added); 141Cong. Rec. S14408-01, S14418 (daily ed. Sept. 27, 1995) (statement of Sen. Kyl) ("Today's system seems to encourage prisoners to file with impunity.") (emphasis added).

If there were a conflict between Federal Rule of Civil Procedure 15 and the PLRA, the rule would have to yield to the later-enacted statute to the extent of the conflict. See Mitchell v. Farcass, 112 F.3d 1483, 1489 (11th Cir. 1997) (a PLRA case) ("a statute passed after the effective date of a federal rule repeals the rule to the extent that it actually conflicts." (quoting and adopting the holding of Jackson v. Stinnett, 102 F.3d 132, 135 (5th Cir. 1996))); Floyd v. United States Postal

27

Serv., 105 F.3d 274, 278 (6th Cir. 1997). But there is no conflict. In proper circumstances and when the requirements contained in Rule 15 are met, the rule does permit amendments or supplements to pleadings in order to bring to the attention of the court changes in the facts, but other law – in this instance section 1997e(e) – determines whether those changes in the facts make any difference. As we have said, the change in the facts (the post-filing release of the plaintiffs) that this purported amendment or supplement brought to the attention of the court makes no difference whatsoever under section 1997e(e).

Rule 15(d) does authorize a court to permit a party to supplement a pleading "even though the original pleading is defective in its statement of a claim for relief or defense." But that rule does not and cannot overrule a substantive requirement or restriction contained in a statute (especially a subsequently enacted one). The decisions the dissenting opinion relies upon are distinguishable. None of them involved a statutory purpose and requirement that the plaintiff be made to bear the differential opportunity cost of a re-filing in order to discourage filings, which is what section 1997e(e) is all about. In none of those decisions would the purpose behind the statutory requirement be defeated by treating subsequently occurring facts as though they had occurred before the complaint was filed. That is the

28

situation we would have here, and it was not present in any of the decisions upon which the dissenting opinion is based.

Take, for example, <u>Mathews v. Diaz</u>, 426 U.S. 67, 96 S.Ct. 1883 (1976). The statutory requirement that an applicant for Social Security benefits commence a civil action within sixty days after the mailing of the decision which is being appealed, <u>see</u> 42 U.S.C. § 405(g), is obviously intended to do what all filing deadlines do – ensure that the action is promptly filed while the facts and issues are fresh, and bring to the process to a close sooner instead of later. One of several plaintiffs in that case had joined in a civil action challenging an eligibility provision before he had actually filed an application with the Secretary of the Department of Health, Education, and Welfare. The Supreme Court held that plaintiff's subsequent filing of the application sufficed, and that the Secretary "could waive the exhaustion requirements which this provision contemplates" and had done so in that case. <u>Id.</u> at 75 - 76, 96 S.Ct. at 1889. As the Supreme Court explained, "For jurisdictional purposes, we treat the [Secretary's] stipulation in the District Court as tantamount to a decision denying the application and as a waiver of the exhaustion requirement." <u>Id.</u> at 76 - 77, 96 S.Ct. at 1890.

The defendants in our case have stipulated away or waived nothing about section 1997e(e). More fundamentally, permitting the plaintiff in <u>Mathews</u> to join

29

a civil action early, which is what happened in that case, does not undermine the statutory purpose that an action be filed promptly, and the sooner the better. Allowing that plaintiff to proceed was in keeping with a statutory purpose. See id. at 75 n.9, 96 S.Ct. at 1889 n.9. By contrast, in this case permitting the plaintiffs to proceed would undermine the statutory purpose of prohibiting these types of claims from being filed by prisoners with nothing but time on their hands.

The other supplemental pleading cases the dissenting opinion relies upon are distinguishable in the same way as Mathews. In all of them Rule 15(d) was used to further the statutory purpose involved, not to defeat it. At the risk of being repetitive, the statutory purpose behind section 1997e(e) is to prevent prisoners from filing a certain type of claim, and to require that they shoulder the differential opportunity costs of filing that type of claim in the free world if they are released.

An analogy may be useful to illustrate our point here. It is well established that the only citizenship of the original parties that matters for purposes of determining whether diversity jurisdiction exists is their citizenship at the time the lawsuit is filed; any changes in a party's citizenship that occur after filing are irrelevant. See Freeport-McMoRan, Inc v. KN Energy, Inc., 498 U.S. 426, 428, 111 S. Ct. 858, 860 (1991); Wichita R.R. & Light Co. v. Public Utilities Comm'n of Kansas, 260 U.S. 48, 54, 43 S.Ct. 51, 53 (1922) ("Jurisdiction once

30

acquired on that ground is not divested by a subsequent change in the citizenship of the parties."). That is the substantive law. If an amendment or supplement to the pleadings is offered to show that the citizenship of one of the original parties has changed since the lawsuit was filed, that amendment or supplement should be denied as futile. The reason it should be denied as futile – and the reason it will make no difference if permitted – is that the parties' citizenship at the time of filing determines that legal issue, which is whether diversity of jurisdiction exists. There is no conflict between the law that citizenship at the time of filing governs for diversity purposes and the liberal allowance of amendments or supplements to the pleading under Rule 15; it is simply that the change in the facts which the amendment or supplement in our diversity jurisdiction hypothetical seeks to bring to the court's attention is irrelevant under the governing law. The same is true here.

The dissenting opinion points out that the present case is not a diversity case. See Dissenting Op. at 57, n.11. That is true, but neither is it a social security case or a copyright case, or any of the other kinds of cases involved in the decisions the dissent relies upon. See id. at 53- 57. The dissenting opinion places particular reliance upon a copyright case, M.G.B. Homes, Inc. v. Ameron Homes, 903 F.2d 1486 (11th Cir. 1990), and it quotes with approval how that opinion swept aside

31

the district court's lack of jurisdiction with the statement that it "was, at most, technically without jurisdiction." Dissenting Op. at 53 (quoting 903 F.2d at 1489). That is a problematic approach given the fact that virtually all jurisdictional rules and issues are "technical." But we do not have the copyright pre-filing registration requirement at issue before us, so we do not pass upon the continuing validity of the panel decision in M.G.B. Homes. Suffice it to say that to the extent, if any, M.G.B. Homes supports the dissent's position, it is to that extent inconsistent with the Supreme Court's subsequent decision in Freeport-McMoRan, which we have already discussed, and we are guided by that Supreme Court decision.

In closing out our discussion of this issue, we express our appreciation to the dissenting opinion for its candor in acknowledging that by bringing this type of claim while incarcerated these six plaintiffs have clearly violated section 1997e(e). As the dissenting opinion acknowledges: "The question is not, what is the meaning of the word 'brought.' It is, instead, what happens when a plaintiff violates section 1997e(e) by bringing a federal civil action while in custody, but is later released, and seeks to supplement his pending complaint to reflect the fact of his release? In other words, what is the remedy for plaintiff's violation of the statute?" Dissenting Op. at 45 - 47 (emphasis in original). The answer, according to the dissenting

32

opinion, is that there is no remedy for such a violation of the statute. Instead, the violation is to be treated as though it never occurred and the plaintiff is not to be sanctioned in any way for the violation – not even by being forced to re-file the claim after release. We disagree, because we do not think the way to enforce congressional enactments is by removing any burden, inconvenience, or expense from those who violate them.

### D. Application to Constitutional Claims

We turn now to one final matter. Under the guise of seeking to avoid what they describe as "serious constitutional questions," the plaintiffs ask us, in effect, to rewrite section 1997e(e) by construing it not to apply to constitutional claims. The panel at least implicitly held that section 1997e(e) does apply to constitutional claims, see Harris, 190 F.3d at 1286, and for three reasons we agree. First, the "avoidance" canon of construction plaintiffs rely upon applies where there is ambiguous statutory language, see Southlake Property Associates, Ltd. v. City of Morrow, Georgia, 112 F.3d 1114, 1119 (11th Cir. 1997), and here there is none. Section 1997e(e) unequivocally states that "No Federal Civil Action may be brought ...," 42 U.S.C. § 1997e(e) (emphasis added), and "no" means no. The

clear and broad  statutory language does not permit us to except any type of claims, including constitutional claims. See Cassidy v. Indiana Dep't of Corrections, 199 F.3d 374, 376 (7th  Cir. 2000) (rejecting the contention that section 1997e(e) does not apply to constitutional claims, and after quoting the first four words of the provision, explaining that "[i]n light of this plain language,  we will not carve out exceptions for which Congress did not provide.").  Courts should not employ the canon of construction that ambiguous statutory language is to  be construed to avoid constitutional questions as a pretext for rewriting clear statutory language. See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 841, 106 S.Ct. 3245, 3251 (1986) ("It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication," and a court "must not and will not carry this [canon] to the point of perverting the purpose of a statute or judicially rewriting it.") (internal marks and citation omitted).

Second, as we have already discussed, the legislative history of the PLRA clearly shows  that its purpose is to substantially reduce the number of prisoner lawsuits.  See supra, at 16 - 20.  That purpose could never be attained if constitutional claims were not covered by the restrictive provisions, because the overwhelming majority of prison lawsuits raise one or more constitutional claims.

Construing section 1997e(e) to be inapplicable to constitutional claims would render it virtually meaningless.

Third, the constitutional issues plaintiffs ask us to rewrite the statute to avoid were decided against them by the panel opinion in this case, see Harris, 190 F.3d at 1287-90, and we have reinstated that part of the opinion as the law of this circuit. See also Davis v. District of Columbia, 158 F.3d 1342, 1345-48 (D.C. Cir. 1998) (rejecting constitutional challenges to section 1997e(e)).

## V.  CONCLUSION

When plaintiffs Chadwick, Cook, Dailey, Harris, Hooks, and Nation brought this "federal civil action,"  they were each a "prisoner confined in a jail, prison, or other correctional facility." For that reason, and notwithstanding the fact that each of them was released from confinement before the district court entered judgment against them,  42 U.S.C. § 1997e(e) applies with full force and effect to them. Accordingly, the judgment of the district court is affirmed, except to the extent that it dismissed with prejudice under section 1997e(e) the claims of those six plaintiffs for monetary relief.  To that extent only, the judgment is vacated and remanded with directions that the monetary relief claims of those six plaintiffs that are barred

solely because of section 1997e(e) are to be dismissed without prejudice to their being re-filed at a time when the plaintiffs are not confined.

AFFIRMED in part and VACATED and REMANDED in part.[13]

---

[13] We decide only the issues that we have expressly addressed and imply no view about any other issue.

ANDERSON, Chief Judge, concurring specially:

I concur in the result, and in much of the reasoning of the majority. I agree with the majority that the statutory language evinces a congressional purpose to discourage, indeed to bar, a prisoner from bringing a suit for mental or emotional injury suffered while in custody without a prior showing of physical injury. I do not believe that it is contrary to the statutory language to routinely dismiss such suits, even if the prisoner has been released after the filing of the suit. Indeed, I believe dismissal would be the appropriate action in most such circumstances; and that dismissal would best serve the congressional language and purpose.

However, I agree with the dissent that Fed.R.Civ.P. 15(d) would provide some discretion in a district judge to entertain a supplemental pleading setting forth the fact of a prisoner's release, and to avoid dismissing a case under some of the more unusual circumstances described by the dissent. In my judgment, a district court should exercise such discretion only rarely (for example, when a prisoner had a colorable claim of physical injury which has been tried to a jury and when a dismissal would involve a manifest waste of judicial resources).

Because it is clear to me that the instant case is not one in which the district judge would exercise discretion to avoid dismissal, a remand would be futile. Accordingly, I concur in the judgment affirming the district court.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part in which BIRCH, BARKETT and WILSON, Circuit Judges, join:

The majority states that Congress enacted 42 U.S.C. § 1997e(e) (passed as part of the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (codified in scattered sections of 42 U.S.C. & 28 U.S.C.) (the "PLRA")) "[i]n an effort to stem the flood of prisoner lawsuits in federal court." Ante at 2. The majority opinion, however, will do just the opposite. For this reason, and because the majority's interpretation of section 1997e(e) cannot be reconciled with either the text of the statutory provision, or the congressional purpose, I dissent from the court's holding that the district court properly dismissed plaintiffs' complaint under section 1997e(e) of the PLRA,[1] even though that section no longer applies to plaintiffs because they are no longer prisoners within the meaning of the Act.[2]

Today the court holds that a district court lacks discretion to allow a former prisoner to supplement his complaint to notice the fact of his release from incarceration. This means that whenever a prisoner files an action for mental or

---

[1] The only issues remaining in this case involve plaintiffs Danny Chadwick, Frederick Harris, Lenois Cook, Willie Hooks, Farrell Nation, and William Dailey. All references to "plaintiffs" herein refer to these six plaintiffs only.

[2] I concur in the majority opinion insofar as it reinstates those parts of the panel opinion that dispose of the claims of plaintiffs Samuel Locklear, Alan Kilgore, Leroy Langes, Dayton Brinkley, and James Wade. See Harris v. Garner, 190 F.3d 1279, 1281-84, 1285-90, vacated and reh'g en banc granted, 197 F.3d 1059 (11th Cir. 1999).

38

emotional injury, the district court has an obligation to dismiss the case no matter what stage the litigation has reached, and regardless of whether section 1997e(e) has ceased to apply in his case. Because the district court must dismiss a former prisoner's case without prejudice, the court will have to entertain the case a second time after essentially the same action is re-filed. Today's decision requires this result even if the first suit reached the summary judgment stage or went to trial. Two full-blown court proceedings may now be required to dispose of one case; this hardly "stem[s] the flood of prisoner lawsuits in federal court."

In Part I, below, I set out the facts of the instant case. In Part II, I explain that because plaintiffs are allowed to supplement their complaint under Rule 15(d) of the Federal Rules of Civil Procedure to notice the fact of their release from incarceration, they should be able to continue their lawsuit against employees of the Georgia Department of Corrections (the "GDC"). Finally, in Part III, I discuss the awful burden that the majority has placed on the judiciary by requiring district courts to dismiss a former prisoner's claims for mental or emotional injury under section 1997e(e), and then entertain his claims anew when the plaintiff re-files what is essentially the same lawsuit.

I.

Eleven plaintiffs brought this civil rights suit for damages and injunctive

relief in the United States District Court for the Middle District of Georgia against

employees of the GDC;[3] six of these plaintiffs are presently before the court.

Plaintiffs alleged violations of their Fourth, Eighth, and Fourteenth Amendment

rights as a result of actions allegedly taken by the defendants during a

"shakedown" at Georgia's Dooly State Prison facility.[4]  The district court referred

the case to a magistrate judge in accordance with 28 U.S.C. § 636 (1994).

On February 4, 1998, before the magistrate judge had issued his report and

recommendation to the district court, plaintiffs moved the court for leave to

withdraw their claims for injunctive relief because they had been released from the

custody of the GDC, and their release had mooted such claims.  See Tucker v.

Phyfer, 819 F.2d 1030, 1033 (11th Cir. 1987).  In his report, the magistrate judge

recognized that "[p]resently pending before" him was "the plaintiffs' motion to

---

[3] The complaint was filed against "Wayne Garner, Commissioner of the Georgia Department of Corrections; A.G. Thomas, Director of Facilities Division of the Georgia Department of Corrections; Duke Blackburn, Executive Assistant, Special Operations of the Georgia Department of Corrections; and Twenty-Two Unnamed Tactical Squad Officers of the Georgia Department of Corrections, in their individual and official capacities."

[4] In this context, a prison "shakedown" is a systematic search of a correctional institution during which prison officials search for illegal drugs and other contraband by means of body cavity searches, searches of inmates' living quarters, and searches of other areas of the institution.  For details regarding the alleged "shakedown," see Harris, 190 F.3d at 1282-83.

withdraw the injunctive claims of six of their number who have been released." He implicitly granted plaintiffs' motion to withdraw their claims for injunctive relief, and despite the fact that plaintiffs were no longer incarcerated, he also recommended that their claims for compensatory and punitive damages be dismissed under 42 U.S.C. § 1997e(e).[5] Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The magistrate judge reasoned that "§ 1997e(e) is applicable to the claims of prisoners who have been released," citing Zehner v. Trigg, 952 F. Supp. 1318, 1324 (S.D. Ind. 1997), and Kerr v. Puckett, 967 F. Supp. 354, 361-62 (E.D. Wisc. 1997), both of which were overturned by the Seventh Circuit in Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir. 1998) (holding that section 1997e(e) does not apply to former prisoners who are no longer incarcerated). It is thus abundantly clear that the magistrate judge treated plaintiffs' complaint as supplemented under Rule 15(d) to reflect the fact that plaintiffs had been released from the custody of the GDC.[6] It is also clear that he

---

[5] 42 U.S.C. § 1997e(e) only precludes prisoners from bringing actions for compensatory and punitive damages. It does not apply to actions for declaratory or injunctive relief. See Harris, 190 F.3d at 1287-89.

[6] The panel stated that the magistrate judge and district court treated the complaint as "amended" for purposes of noticing plaintiffs' release from custody. Harris, 190 F.3d at 1284. Technically, this was an error since the magistrate judge and district court actually treated the

recommended dismissal of plaintiffs' claims for compensatory and punitive damages despite the fact that plaintiffs were no longer incarcerated. His recommendation, in this regard, was based on an error in interpreting section 1997e(e) to apply to the claims of former prisoners who are no longer incarcerated. The district court adopted the magistrate judge's recommendation without relevant modification, and dismissed plaintiffs claims with prejudice.[7]

complaint as "supplemented" under Rule 15(d); plaintiffs release from custody was a "transaction[] or occurrence[] or event[] which . . . happened since the date of the [original] pleading," Fed. R. Civ. P. 15(d), and not an event which happened prior to the date of the original complaint. Only prior events are properly treated as amendments under Rule 15(a). The error is substantively unimportant, however. See Glatt v. Chicago Park Dist., 87 F.3d 190, 194 (7th Cir. 1996) (holding that the standard applied to cases in which parties seek to supplement their pleadings under Rule 15(d) is the same as the standard applied to cases in which plaintiffs seek to amend their pleadings under Rule 15(a)).

[7] I am thus uncertain why the majority is not "entirely convinced that the complaint was actually amended." Ante at 23. The majority appears suspicious of the panel's conclusion that "the magistrate judge treated the complaint as amended" to reflect the fact of plaintiffs' release from the GDC, Harris, 190 F.3d at 1283, because

> [n]o motion to amend the complaint was filed, and neither the magistrate judge nor the district court said the complaint had been amended. The plaintiffs did file a motion to withdraw their request for injunctive relief, which simply acknowledged that there was no longer any need for an injunction in view of their release. But the court did not formally rule on that motion. Instead, the magistrate judge (whose recommendations were adopted by the district court without relevant change) concluded: "These plaintiffs cannot obtain monetary relief because they alleged only mental or emotional injuries and their injunctive claims are moot since they have been released from prison."

Ante at 23 n.10. The majority recognizes that plaintiffs did file a motion alerting the court that they had been released from custody, and seeking to withdraw their claims for injunctive relief because their release had mooted such claims. Therefore, it is simply not true that "[n]o motion to [supplement] the complaint was filed." Id. The motion was not titled "MOTION TO SUPPLEMENT PLAINTIFFS' COMPLAINT TO REFLECT THE FACT OF PLAINTIFFS' RELEASE FROM CUSTODY, AND TO ALERT THE DISTRICT COURT THAT PLAINTIFFS ARE NO LONGER SUBJECT TO 42 U.S.C. § 1997e(e);" plaintiffs' motion concerned, instead, their claims for injunctive relief (not covered by section 1997e(e)). But it is

42

clear that the magistrate judge treated the complaint as supplemented for the purpose of determining whether section 1997e(e) applied to plaintiffs' claims for compensatory and punitive damages, even though plaintiffs were no longer incarcerated; the record reflects that the magistrate judge (1) recognized in his report and recommendation to the district court that plaintiffs had been released from the custody of the GDC, and (2) recommended dismissal of plaintiffs' claims for compensatory and punitive damages based on the erroneous conclusion that "§ 1997e(e) is applicable to the claims of prisoners who have been released." The district court, in its order adopting the magistrate judge's recommendations, likewise treated plaintiffs' complaint as supplemented to reflect the fact of plaintiffs' release, but nevertheless dismissed plaintiffs' complaint under an erroneous reading of section 1997e(e).

There is no doubt that the magistrate judge and the district court had the power, even the obligation, to treat plaintiffs' complaint as supplemented to reflect the fact of their release. See Foman v. Davis, 37 U.S. 178, 181, 83 S. Ct. 227, 229-30 9 L. Ed. 2d 222 (1962) (courts have an obligation to read the parties' pleadings with the intent of the parties in mind); cf. Fed. R. Civ. P. 15(b) (allowing parties to amend their pleadings to conform to the evidence, either at trial or even after judgment, and stating that "[i]f evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits"). The majority's assertion that "the requirements of Rule 15(d) were not met," ante at 24, is curious. In Matthews v. Diaz, 426 U.S. 67, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976), the Supreme Court made clear that Rule 15(d)'s "requirements" should not be read to impede a decision on the merits because of a technical error or omission. In Matthews, as in the instant case, "[t]here was no [formal] motion to supplement the pleadings." Ante at 24 n.11. Despite this omission, the Supreme Court held that

> "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Although the defect in [plaintiff's] allegations must be cured by supplemental pleading, instead of amended pleading, the statutory purpose of avoiding needless sacrifice to defective pleading applies equally to this case . . . . Despite [plaintiff's] failure to supplement the complaint, the District Court was aware that he had filed his application; since the Secretary stipulated that the application had been filed, the defect in the pleadings surely did not prejudice him.

Matthews, 426 U.S. at 75 n.9, 96 S. Ct. at 1889 n.9 (citations omitted) (emphasis added). As in Matthews, the district court in the instant case was obviously aware of the critical fact (that plaintiffs had been released from incarceration), since plaintiffs filed a motion alerting the court that they had been released from custody, and seeking to withdraw their claims for injunctive relief. Also, there is no reasonable argument that the court's allowance of a motion to supplement the complaint in any way prejudiced the defendants, since defendants cited Zehner v. Trigg, 952 F. Supp. 1318 (S.D. Ind. 1997) (holding that section 1997e(e) applies to the claims of prisoners who have been released from custody), in their motion to dismiss plaintiffs' complaint. Defendants, therefore, anticipated that plaintiffs' release would require them to convince the

43

II.

Following, I discuss three elements necessary to resolve the question of whether to allow plaintiffs to supplement their complaint to reflect the fact of their release, and thus to allow them to continue their civil suit against employees of the GDC. These are: (1) under 42 U.S.C. § 1997e(e), prisoners <u>cannot</u> bring federal civil actions for "mental or emotional injury suffered while in custody without a prior showing of physical injury" while they are confined; (2) after they are released from confinement, former prisoners <u>can</u> bring federal civil actions for "mental or emotional injury suffered while in custody without a prior showing of physical injury;" and (3) Rule 15(d) of the Federal Rules of Civil Procedure allows litigants to supplement their pleadings to "set[] forth transactions or occurrences or events which have happened since the date of the [original] pleading . . . even though the original pleading is defective in its statement of a claim for relief or defense." After discussing these elements, I then ask whether Congress has indicated, either in the statutory text or in the legislative history of the PLRA, its

court that section 1997e(e) should bar plaintiffs' claims for mental or emotional injury, even though plaintiffs were no longer incarcerated. Treating Rule 15(d) as if it has certain "requirements" that can never be waived by the district court, even if waiver would facilitate a proper decision on the merits, does not comport with the concept of notice pleading, and the purpose behind the Federal Rules. <u>See</u> <u>infra</u> at 49 - 60 (discussing the 1963 amendment to Rule 15(d) and the philosophy of the Federal Rules of Civil Procedure).

44

intent to abrogate Rule 15(d) in applying section 1997e(e), so that prisoners should be precluded from supplementing their complaints to reflect the fact of their release.

A.

42 U.S.C. § 1997e(e) precludes prisoners from bringing federal civil actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury" while they are "confined in a jail, prison, or other correctional facility." For reasons not entirely clear to me, the majority spends most of its opinion focusing on this element, canvassing every part of the PLRA to come up with the totally unremarkable conclusion that when section 1997e(e) says "[n]o Federal civil action may be brought," it means that no prisoner can "commence or start a lawsuit," ante at 5, for "mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

I have no idea why the majority goes to such lengths to demonstrate this point, or what other definition of the word "brought" might be considered plausible. The majority appears to believe that the panel mistakenly interpreted "brought" to mean "maintain[ed]" or "continue[d]," ante at 5, and that this was the source of its supposed error in holding that plaintiffs should be allowed supplement

45

their complaint to reflect the fact of their release. But following the majority's reasoning, it would make no difference if the statute prohibited the "commencing" of a federal civil action, or the "maintenance" of a federal civil action while in custody. According to the majority, a violation of the statute requires the district court to dismiss the plaintiff's suit no matter what events transpire subsequent to the violation. If this is the case, then the district court would have to dismiss a suit, even after the prisoner's release, that was "maintained" by a prisoner while in custody, just as the court would have to dismiss a suit that was "commenced" while in custody. I thus fail to understand the majority's distinction, but in any case, it is of no moment. It is obvious that the word "brought" means "commence[d] or start[ed]," ante at 5, and so I have no quibble with this aspect of the majority opinion.[8] The question is not what is the meaning of the

---

[8] In its discussion of the statutory language, the majority suggests that one line of cases, interpreting the full payment provision of the PLRA, does more than establish that "brought" means "commenced." 28 U.S.C. § 1915(b)(1) (1994 & Supp. II 1996) provides that

> if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of–
> (A) the average monthly deposits to the prisoner's account; or
> (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

In Gay v. Texas Dept. of Corrections States Jail Div., 117 F.3d 240 (5th Cir. 1997), and in Robbins v. Switzer, 104 F.3d 895 (7th Cir. 1997), the Fifth and Seventh Circuits held that this part of the PLRA requires former prisoners to pay amounts due under the statute through the time of their release in order to continue prosecuting claims filed while in custody. This interpretation of section 1915(b)(1) makes sense because, as the D.C. Circuit has observed, if a prisoner has not complied with the filing fee provisions of the statute, he still has "past due,

word "brought." It is, instead, what happens when a plaintiff violates section 1997e(e) by bringing a federal civil action while in custody, but is later released, and seeks to supplement his pending complaint to reflect the fact of his release? In other words, <u>what is the remedy</u> for plaintiff's violation of the statute?

---

unmet obligations" even if he is later released. <u>In re Smith</u>, 114 F.3d 1247, 1251-52 (D.C. Cir. 1997). All of the circuits interpreting section 1915(b)(1) recognize that the statute ceases to apply when a prisoner is released; it has not been applied to require prisoners to pay fees that would accrue <u>after</u> the prisoner is released. As the D.C. Circuit held in <u>Smith</u>,

> [plaintiff's] liability for the PLRA fees that should have been paid prior to his release from prison under § 1915(b) [should] be calculated, and [plaintiff] must pay that amount . . . . However, [plaintiff] may rely on in forma pauperis status for the balance of the filing fee . . . , as his current poverty does not pose a bar to relief, except with respect to past due amounts under the PLRA that were assessed based upon a calculation that Smith had means to pay them when due.

<u>Id.</u> at 1252 (citations omitted); <u>see also</u> <u>Robbins</u>, 104 F.3d at 898 ("[I]f according to the trust account statements [plaintiff] could (and therefore should) have paid $50 at the time he filed his appeals, and the trust accounts received no income before his release, then he must pay $50 now and may apply for in forma pauperis status on the balance. How much [plaintiff] actually must prepay depends on the application of the formula in § 1915(b) to the balances and income of his trust account through the day of his release."). It is reasonable to require former prisoners to meet past due obligations that constitute a condition precedent to their ability to bring suit, even after they have been released from custody. The full payment provision of section 1915(b)(1) is not being applied to them as <u>former prisoners</u>, but as persons who have incurred a debt that has not yet been satisfied. In the instant case, the majority uses section 1997e(e) to bar plaintiffs claims, even though the statute no longer applies in their cases. The majority's analogy would work if Congress had provided for a civil fine for violations of section 1997e(e) (e.g., a fine of $10 for each pre-release filing); in that circumstance, even after his release a former prisoner would still owe the fine for filing while incarcerated, because the fine owed would constitute a past due amount. But it seems odd to suggest, as the majority does, that plaintiffs in the instant case are owed a "past due dismissal" because they filed while incarcerated. <u>Cf.</u> <u>Murphy v. Magnusson</u>, No. Civ. 98-439-P-C. (D. Me. July 27, 1999) (refusing to dismiss plaintiff's claim filed while incarcerated even though plaintiff had not complied with the administrative exhaustion requirement of 42 U.S.C. § 1997e(a), because plaintiff had since been released from custody; "where Plaintiff could immediately refile his claims without exhausting administrative remedies . . . it would not serve judicial efficiency to dismiss Plaintiff's Complaint. Because circumstances have changed such that Plaintiff is no longer required . . . to exhaust administrative procedures, the Court will not now require Plaintiff to exhaust available administrative remedies.").

The second element is that 42 U.S.C. § 1997e(e) does not apply to former prisoners who are no longer incarcerated.  As the panel explained,

> 42 U.S.C. § 1997e(e) provides: "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  Section 1997e(h) defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h) (Supp. II 1996).  According to the plain language of the statute, section 1997e(e) does not apply to former prisoners, or those who have been released from a correctional facility, because such persons are clearly not "confined in a jail, prison, or other correctional facility," or "incarcerated or detained in any facility."  The statute could not be more plain: it applies to those who (a) seek a civil remedy for mental or emotional injury suffered while in custody, and (b) seek such a remedy while they are incarcerated.  As the Seventh Circuit has noted in analyzing section 1997e(e), "[t]he statutory language does not leave wriggle room."  Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir.1998).  It does not apply to persons who have never been prisoners; nor does it apply to former prisoners who seek civil relief for injuries suffered while they were prisoners.
>
> Defendants argue that Congress' purpose in enacting the PLRA was to curtail frivolous prisoner litigation, and that reading the statute to bar certain claims by current but not former prisoners is not faithful to congressional intent because, under our interpretation today, some claims "for mental or emotional injury suffered while in custody" can be brought "without a prior showing of physical injury."  Further, defendants see little sense in discriminating between prisoners who bring suit while they are incarcerated, and former prisoners who seek relief on the same day they are released.
>
> Absent mistake or absurdity, we implement the statutory language as enacted.  Salinas v. United States, 522 U.S. 52, 57-58, 118 S. Ct. 469, 473- 74, 139 L. Ed. 2d 352 (1997).  Here, the language of section 1997e(e) could not be clearer.  And contrary to defendants'

congressional intent argument, Congress manifestly wanted to draw a bright line distinction between those who <u>are</u> prisoners, and those who are <u>not</u> prisoners. <u>See</u> 141 Cong. Rec. S7524-26 (daily ed. May 25, 1995) (statements by Senators Dole and Kyl) (prisoners have a unique incentive to file frivolous lawsuits because litigation "has become a recreational activity for long-term residents of our prisons," because prisoners "have little to lose and everything to gain," and because filing frivolous complaints is "a means of gaining a short sabbatical in the nearest Federal courthouse") (citations and internal quotation marks omitted). The distinction makes a good deal of sense because the "[o]pportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits." <u>Kerr</u>, 138 F.3d at 323. In light of the overwhelming clarity of the statutory text, we join the Seventh Circuit in holding that section 1997e(e) applies only to prisoners who are incarcerated at the time they seek relief, and not to former prisoners who seek damages for injuries suffered while they were incarcerated. <u>See id.</u>; <u>see also</u>, <u>Greig v. Goord</u>, 169 F.3d 165, 167 (2d Cir.1999) (interpreting "prisoner" as used in section 1997e(a), dealing with administrative exhaustion, as not applying to former prisoners no longer incarcerated); <u>Doe v. Washington County</u>, 150 F.3d 920, 924 (8th Cir.1998) (interpreting "prisoner" as used in section 1997e(d), dealing with attorneys' fees, as not applying to former prisoners).

<u>Harris</u>, 190 F.3d at 1284-85. The majority concurs in this holding today. <u>See</u> <u>ante</u> at 22 ("Because section 1997e(e) applies only to claims filed while an inmate is confined, it does not prevent a former prisoner from filing after release a monetary damages claim for mental or emotional injury suffered while confined, without a prior showing of physical injury.").

The third and final element is that under Rule 15(d) of the Federal Rules of Civil Procedure, litigants are allowed to supplement their pleadings to "set[] forth

transactions or occurrences or events which have happened since the date of the [original] pleading . . . even though the original pleading is defective in its statement of a claim for relief or defense." Prior to 1963, the text of Rule 15(d) read, in part, as follows:

> Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.

Minnesota Mining and Mfg. Co. v. Superior Insulating Tape Co., 284 F.2d 478, 481 (8th Cir. 1960) (quoting Fed. R. Civ. P. 15(d)) (emphasis omitted). Because of this wording, "several federal courts held that a supplemental complaint could not be used to cure a complaint that failed to state a claim for relief, even though subsequent events had made plaintiff's right to relief apparent and the later pleading effectively cured the deficiencies in the initial effort." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1505 (2d ed. 1990). The theory these courts used was that "plaintiff's right to relief had to be predicated on facts in existence at the time the complaint was filed." Id.; see, e.g., La Salle Nat'l. Bank v. 222 East Chestnut St. Corp., 267 F.2d 247, 252 (7th Cir. 1959); Bonner v. Elizabeth Arden, Inc., 177 F.2d 703, 705 (2d Cir. 1949). But see Camilla Cotton Oil Co. v. Spencer Kellogg and Sons, Inc., 257

50

F.2d 162, 165, 167-68 (5th Cir. 1958) (allowing plaintiff, under pre-1963 Rule 15(d), to supplement claim for attorney's fees with a pleading indicating that the statutory notice required for plaintiff to get attorney's fees had been satisfied subsequent to the filing of the claim, even though the claim was "imperfect until proper notice was given");[9] United States v. Reiten, 313 F.2d 673, 674-75 (9th Cir. 1963) (allowing plaintiff, under pre-1963 Rule 15(d), to supplement complaint with notice to the court that the ninety days required by federal statute before plaintiff had a "right to sue" had expired since the filing of the complaint because "[t]o require appellant to commence a new and separate action in these circumstances would have been to insist upon an empty formalism").  In response to what was perceived as the useless formality of forcing a district court to dismiss a suit without prejudice, so that the plaintiff could then re-file the suit based on subsequent events that had made clear his right to relief, Rule 15(d) was amended in 1963 to include the following language: "Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense."  The advisory committee's note to the 1963 amendment emphasizes that the amended Rule is intended to allow both courts and litigants flexibility in

_____

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

addressing the substance of a plaintiff's complaint, rather than require parties to

engage in an empty ritual of mindless form:

> Rule 15(d) is intended to give the court broad discretion in allowing a supplemental pleading. However, some cases, opposed by other cases and criticized by the commentators, have taken the rigid and formalistic view that where the original complaint fails to state a claim upon which relief can be granted, leave to serve a supplemental complaint must be denied . . . . Thus plaintiffs have sometimes been needlessly remitted to the difficulties of commencing a new action even though events occurring after the commencement of the original action have made clear the right to relief.
>     Under the amendment the court has discretion to permit a supplemental pleading despite the fact that the original pleading is defective.

Fed. R. Civ. P. 15(d) advisory committee's note (1963). Thus, it is now clear that

plaintiffs are allowed to supplement their pleadings, even if their claim for relief is

entirely dependent on events occurring subsequent to the filing of their original

complaints.

It is also clear that plaintiffs can cure jurisdictional defects in their original

complaints by means of a supplemental pleading. In Matthews v. Diaz, 426 U.S.

67, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976), plaintiff filed a complaint under the

Social Security Act, challenging the constitutionality of a provision of the Act

which conditioned an alien's eligibility for benefits on continuous residence in the

United States for a five-year period and admission for permanent residence.

Plaintiff filed his complaint on October 24, 1972; but it was not until two days

later, on October 26, that plaintiff actually filed an application for enrollment in the Social Security benefits program, and then brought the fact of his application to the attention of the district court (without formally supplementing his complaint). The statutory provision giving plaintiff a right of action, provided that

> [a]ny individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

42 U.S.C. § 405(g) (1994) (emphasis added). Because plaintiff had filed his action before he had applied for benefits, the Supreme Court had to decide "whether the District Court had jurisdiction over [plaintiff's] claim." Matthews, 426 U.S. at 75, 96 S. Ct. at 1889. The Court responded as follows:

> We have little difficulty with [plaintiff's] failure to file an application with the Secretary until after he was joined in the action. Although 42 U.S.C. § 405(g) establishes filing of an application as a nonwaivable condition of jurisdiction . . . , [plaintiff] satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact. Under these circumstances, we treat the pleadings as properly supplemented by the Secretary's stipulation that [plaintiff] had filed an application.

Id. (citations omitted). The Court further elaborated,

> "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Although the

53

> defect in [plaintiff's] allegations must be cured by supplemental pleading, instead of amended pleading, the statutory purpose of avoiding needless sacrifice to defective pleading applies equally to this case . . . . Despite [plaintiff's] failure to supplement the complaint, the District Court was aware that he had filed his application; since the Secretary stipulated that the application had been filed, the defect in the pleadings surely did not prejudice him.

Id. at 75 n.9, 96 S. Ct. at 1889 n.9 (citations omitted).

Until today, this court has consistently followed the Supreme Court's direction that a supplemental pleading should be liberally allowed if it will cure a defect in the complaint. In M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486 (11th Cir. 1990), plaintiff sued for infringement under the Copyright Act, which provides, in pertinent part,

> no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.

17 U.S.C. § 411(a) (1994) (emphasis added). Plaintiff filed a complaint for infringement before applying for copyright registration, but later moved the court to supplement its pleading with notice that it had since filed the required application with the Copyright Office. The district court allowed the supplement and we affirmed, even though "[t]he registration requirement is a jurisdictional prerequisite to an infringement suit." Id. at 1488. We stated,

> [the district court] was, at most, technically without jurisdiction to entertain [plaintiff's] motion to amend its complaint. However, it is

54

entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.

. . . .

The amended complaint submitted by [plaintiff] contained all the required allegations. On its face it asserted that the trial court had jurisdiction over the new infringement action. Except for the technical distinction between filing a new complaint and filing an amended complaint, the case would have been properly filed.

Id. at 1489 (internal citation and quotation marks omitted);[10] see also Lussier v. Dugger, 904 F.2d 661, 669-70 (11th Cir. 1990) (holding that plaintiff should be allowed to supplement his complaint with the fact that since filing against a state agency under the federal Rehabilitation Act, the Act had been amended to abrogate the state's Eleventh Amendment immunity, and thus the district court had jurisdiction over the case for any violations that took place subsequent to the date of the amendment's enactment); Rowe v. United States Fidelity and Guar. Co., 421

---

[10] The majority makes the remarkable assertion that the approach taken in M.G.B. Homes is "problematic," and suggests that the "continuing validity" of the case may be in doubt in light of the Supreme Court's decision in Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 111 S. Ct. 858, 112 L. Ed. 2d 951 (1991). Ante at 31-32. Freeport-McMoRan had nothing to do with a federal court's ability to allow a plaintiff to supplement his complaint to cure a jurisdictional defect in the original pleading when, as in M.G.B. Homes and in the instant case, the court's jurisdiction is premised on the existence of a federal question. In that case, the Supreme Court merely reaffirmed the longstanding rule that "diversity of citizenship is assessed at the time the action is filed . . . . [I]f jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." Id. at 428, 111 S. Ct. at 860. As I explain infra at 57 n. 11, the issue of diversity jurisdiction implicates unique considerations that do not apply in cases in which the federal court's jurisdiction is premised on the existence of a federal question. It seems odd for the majority to assert casually that the "continuing validity" of M.G.B. Homes is in doubt, when the only evidence the majority cites for that proposition is a Supreme Court case that is clearly inapposite.

F.2d 937, 940, 944 (4th Cir. 1970) (holding that district court abused its discretion in denying plaintiffs, as creditors of an insured, leave to supplement their complaint, originally filed before the insured had assigned his rights in the insurance to the creditors, with notice that the insured had since assigned his rights; this was so even though the "action [was] judicially cognizable at all . . . only through [the] assignment"); Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1108-09 (9th Cir. 1970) (holding that it was error for the district court to dismiss plaintiff's complaint for lack of jurisdiction under the Copyright Act, which provided that no infringement action "shall be maintained" until the work is registered, when the plaintiff registered the work subsequent to the filing of its complaint, and a pretrial conference order evidenced that the court treated the complaint as supplemented); Security Ins. Co. v. United States, 338 F.2d 444, 449 (9th Cir. 1964) (holding that plaintiff should be allowed to supplement his complaint under the Miller Act, originally filed before the statutory period of ninety days provided for in 40 U.S.C. § 270b(a) had elapsed, with notice that ninety days had since elapsed, because the federal rules encourage "decision[s] on the merits"); Katzman v. Sessions, 156 F.R.D. 35, 39 (E.D.N.Y. 1994) (holding that plaintiff should be allowed to supplement his complaint with notice that he had exhausted the administrative remedies required for him to file suit under the

56

Freedom of Information Act, 5 U.S.C. § 552 (1994); the fact that he did not exhaust until after filing did not require dismissal); Montgomery Envtl. Coalition v. Fri, 366 F. Supp. 261, 265-66 (D.D.C. 1973) (holding that plaintiffs should be allowed to supplement their complaint with notice that the statutory period of sixty days required under the Water Pollution Control Act had elapsed since they filed their complaint; this was so even though 33 U.S.C. § 1365(b) provided that "[n]o action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation") (emphasis added); Amar v. Garnier Enters., Inc., 41 F.R.D. 211, 214-15 (C.D. Cal. 1966) (holding that plaintiff should be allowed to supplement his complaint with notice that since filing shareholder's derivative action under California law, he had become a registered shareholder; this was so even though California Corporations Code provided that "[n]o action may be instituted or maintained in right of any . . . corporation . . . by the holder . . . of shares . . . unless . . . the plaintiff alleges in the complaint that he was a . . . registered shareholder . . . at the time of the transaction or any part thereof of which he complains") (emphasis added); Lynam v. Livingston, 257 F. Supp. 520, 524-25 (D. Del. 1966) (holding that plaintiff should be allowed to supplement her complaint filed as a shareholder's derivative action with notice that since filing, she had made a demand upon the board of directors to prosecute the claim; "the

57

fact that plaintiff was without standing to sue when suit was begun cannot deprive her of the right to allege in a supplemental complaint that after suit was instituted she complied with all conditions required to give her a right to sue").[11]

The courts' liberal allowance of supplemental pleadings to enable parties to state a case or cure a jurisdictional defect is consistent with the underlying

---

[11] The majority analogizes the instant case to a situation in which the federal court has jurisdiction over a claim only because of the diversity of the parties' citizenship, and states, correctly, that "only citizenship of the original parties . . . matters for purposes of determining whether diversity jurisdiction exists." Ante at 30. The unique considerations involved in addressing the existence of diversity jurisdiction, including concerns over parties acting strategically to defeat the statutory requirement, see Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374, 98 S. Ct. 2396, 2403, 57 L. Ed. 2d 274 (1978), make necessary a "brightline policy of determining diversity as of the date of commencement of the action." 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3608 (2d ed. 1984).

This is not a diversity case, but a case in which our jurisdiction is premised upon the existence of a federal question of no less than constitutional dimension; plaintiffs sued for violations of their Fourth, Eighth, and Fourteenth Amendment rights. Therefore, the diversity analogy is inapposite. The distinction between diversity and federal question jurisdiction, as it relates to the issue of whether parties can supplement their pleadings to cure a jurisdictional defect, is made clear by the myriad cases I cite that allow plaintiffs to supplement their original complaints with notice that, since filing, they have fulfilled the jurisdictional prerequisites to bring suit. These cases include Supreme Court precedent which explicitly states, in a case in which the Court's jurisdiction was premised on the existence of a federal question, that

"[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653. Although the defect in [plaintiff's] allegations must be cured by supplemental pleading, instead of amended pleading, the statutory purpose of avoiding needless sacrifice to defective pleading applies equally to this case.

Matthews, 426 U.S. at 75 n.9, 96 S. Ct. at 1889 n.9.

The majority is correct to note that just as this is "not a diversity case . . ., neither is it a social security case or a copyright case." Ante at 31. But that is not the point. The point is that this is a case in which our jurisdiction is premised on the existence of a federal question, and not a case in which we have jurisdiction only because the parties are diverse. Plaintiffs did not attempt to supplement their complaint to notice the fact of their acquired diversity; they sought to supplement their complaint to notice the fact that a federal law (section 1997e(e)) no longer applies in their case.

philosophy of the Federal Rules of Civil Procedure, that the Rules should "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman, 371 U.S. at 181-82, 83 S. Ct. at 230. Thus, courts routinely grant leave to parties to amend their pleadings under Rule 15(a) to set forth transactions, occurrences, or events that could have been included in the original pleading, but were omitted for one reason or another. See id. ("In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought [to amend] should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."); Bank v. Pitt, 928 F.2d 1108, 1112 (11th Cir. 1991) ("If our precedent leaves any doubt regarding the

rule to be applied in this circuit, we now dispel that doubt by restating the rule. Where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice."); Warner v. Alexander Grant & Co., 828 F.2d 1528, 1531 (11th Cir. 1987) (holding that it was error for the district court to dismiss with prejudice without granting leave to amend because "[t]he district court's order contravened the well established policy in the federal courts favoring liberal pleading requirements"); Czeremcha v. International Ass'n of Machinists & Aerospace Workers, 724 F.2d 1552, 1556 (11th Cir. 1984) (holding that leave to file an amendment should be "granted liberally"). And under Rule 15(b), courts should allow amendments to conform the pleadings to the evidence both during trial, and even after judgment, as long as the opposing party cannot prove that he is thereby prejudiced:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that

the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

Fed. R. Civ. P. 15(b). All of this is in conformance with the "liberal system of notice pleading set up by the Federal Rules," requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 1163, 122 L. Ed. 2d 517 (1993) (internal quotation marks omitted). The American legal system encourages the efficient resolution of claims on the merits, and not the avoidance of legal issues by means of tightfisted pleading requirements that constitute nothing more than traps for the unwary.

With all three elements on the table, we can now answer the question of whether plaintiffs in the instant case can supplement their complaint to reflect the fact of their release, and thus continue their civil lawsuit against employees of the GDC; and the answer is obviously that they can. 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." There is nothing in the plain language of the statute that suggests that Congress wanted federal courts to ignore Rule 15(d) in applying section 1997e(e). Given that the Federal Rules of Civil Procedure do, themselves, have statutory effect, see United States v. St. Paul

61

Mercury Ins. Co., 361 F.2d 838, 839 (5th Cir. 1966), and given the enormous body of caselaw applying Rule 15(d) to cases in which plaintiffs must supplement their complaints in order to state a case or cure a jurisdictional defect, we would expect Congress to speak with unmistakable clarity if it wanted to override the Federal Rules of Civil Procedure in PLRA cases. See Conroy v. Aniskoff, 507 U.S. 511, 516 & n.10, 113 S. Ct. 1562, 1566 & n.10, 123 L. Ed. 2d 229 (1993) (holding that there is a presumption that Congress is aware of the relevant case law); Chisom v. Roemer, 501 U.S. 380, 396, 111 S. Ct. 2354, 2364, 115 L. Ed. 2d 348 (1991) (holding that if Congress had an intent to deviate from an established legal rule, "Congress would have made it explicit in the statute"). But there is no such unmistakable statement of abrogation; there is not even a hint in the statute that federal courts should abandon the usual rules of pleading, and disallow supplements which have always (at least since 1963) been freely allowed in the normal course to cure a defective complaint. See Matthews, 426 U.S. at 75 n.9, 96 S. Ct. at 1889 n.9 ("[T]he statutory purpose of avoiding needless sacrifice to defective pleading applies equally" in cases in which plaintiffs must supplement their complaints, as it does to cases in which plaintiffs seek to amend.); Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995) ("[L]eave to file a supplemental

62

pleading should be freely permitted."); Music Deli & Groceries, Inc. v. IRS, 781 F. Supp. 992, 997 (S.D.N.Y. 1991) (same).

It does not appear that anyone in Congress even thought about the proposition that Rule 15(d) might not apply in PLRA cases. Despite the majority's "irresistible" impulse to dive into the legislative history, ante at 15, there is not one word from anyone in Congress, or anyone commenting upon the ramifications of the Act, that indicates that Rule 15(d) might not apply in PLRA cases. See Chisom, 501 U.S. at 396 & n.23, 111 S. Ct. at 2364 & n.23 (holding that if Congress had an intent to deviate from an established legal rule when it enacted a statute, "at least some of the Members would have identified or mentioned [the issue] at some point in the . . . legislative history . . . . Congress' silence in this regard can be likened to the dog that did not bark."). In light of today's decision, whenever Congress enacts a statute that qualifies the right of a person to "bring" or "commence" or "institute" an action under federal law, district courts in the Eleventh Circuit will have to conclude that Rule 15(d) is inapplicable, and that courts lack discretion to allow supplemental pleadings to enable a party to state a case or cure a jurisdictional defect. See ante at 30 ("If an amendment or supplement to the pleadings is offered to show that the citizenship of one of the

original parties has changed since the lawsuit was filed, that amendment or supplement should be denied as futile.").

Further, it is clear from the text of the statute that if Congress had wanted to override a Federal Rule of Civil Procedure, it certainly knew how to do so. In the same statutory section as 42 U.S.C. § 1997e(e), Congress provided in section 1997e(c)(1) that

> [t]he court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

42 U.S.C. § 1997e(c)(1). This statutory provision clearly overrides a defendant's normal obligation to file a Rule 12(b)(6) motion or other responsive pleading with the court in order to obtain a pre-answer dismissal, by allowing the court to dismiss sua sponte a plaintiff's action if it is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." Id. We read each statutory provision with reference to the whole Act. See Massachusetts v. Morash, 490 U.S. 107, 115, 109 S. Ct. 1668, 1673, 104 L. Ed. 2d 98 (1989). Where Congress has demonstrated its ability to provide for a particular remedy with specific statutory language, we should not

read a statutory provision that contains no such specific language to allow for the particular remedy at issue. See Dean v. American Sec. Ins. Co., 559 F.2d 1036,1039 (5th Cir. 1977); see generally Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 38, 118 S. Ct. 956, 963, 140 L. Ed. 2d 62 (1998); West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 111 S. Ct. 1138, 113 L. Ed. 2d 68 (1991). Congress knew how to abrogate the Federal Rules when it wanted to do so, in section 1997e(c)(1). Because Congress enacted no abrogating language in section 1997e(e), it could not have meant that courts should ignore Rule 15(d) of the Federal Rules of Civil Procedure in applying that section of the PLRA.

So, the ultimate question remains: if Congress did not mean to override Rule 15(d) in enacting section 1997e(e), what is the remedy for a violation of the statute? The answer, again, is simple. If a federal civil action is brought by a confined prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury," then the defendant should move the court to dismiss the case under 42 U.S.C. § 1997e(e). If the plaintiff cannot supplement his complaint to cure the defect, then the court should dismiss the case. If, on the other hand, the plaintiff can cure the defect with notice that section 1997e(e) no longer applies to him, because he has been released from custody, then

absent "undue delay, bad faith, dilatory tactics, [or] undue prejudice . . . , the motion [to supplement under Rule 15(d)] should be freely granted." Quaratino, 71 F.3d at 66. Neither this court, nor the Supreme Court, has ever held that when Congress restricts a plaintiff's right to bring a cause of action, we should do anything other than obey the congressional command by using the usual procedures for pleading, adjudication, and dismissal. Absent explicit direction to the contrary, there is no reason to do so today.[12]

B.

---

[12] The majority calls this "no remedy" at all, ante at 32, because the practical effect of such a holding is that plaintiffs who have been released from incarceration following their violation of section 1997e(e) will suffer no sanction (other than the burden of alerting the court to the fact of their release). The majority states, "[w]e disagree, because we do not think the way to enforce congressional enactments is by removing any burden, inconvenience, or expense from those who violate them." Ante at 32. Much like the rest of the majority opinion, this sounds good at first blush but it is ultimately without substance. First, the judicial task is to enforce Congress' enactments as written, not to dream up "burden[s], inconvenience[s], [and] expense[s]" to levy on those who violate the congressional command. Where Congress has given us no indication that the remedy we would like to pursue is available under the statute, then it is a violation of the separation of powers for us to enact a remedial scheme that was never envisioned by the legislature. Second, for all its grandstanding about the need to sanction disobedient plaintiffs, the sum total of the "burden[s], inconvenience[s], [and] expense[s]" that the majority has imposed is a second filing fee on plaintiffs, when they re-file their suit after being released from incarceration. Finally, as discussed infra in Part III, the real "burden[s], inconvenience[s], [and] expense[s]" that flow from the majority's holding are going to be visited upon the judiciary, when courts are forced to dismiss suits (sometimes at summary judgment or at trial), and then go through the administrative nightmare of entertaining the same suit again when the plaintiff re-files his action.

66

Lacking any textual or case support, the majority attempts to prop up the court's holding with references to the legislative history that purportedly establish that Congress' single-minded goal in enacting section 1997e(e) was to curtail prisoner "filing[s]" of lawsuits challenging conditions of confinement. See ante at 16-17, 25-26. Congress was so driven by its objective to stamp out prisoner "filing[s]," we are told, that once a prisoner commits the unpardonable error of "filing" while still incarcerated, all other considerations are out; the suit must be dismissed come hell or high water. First, it is important to note how crucial this legislative history is to the majority's argument, in an opinion that purports to take a textualist approach to statutory interpretation, see ante at 4 ("We begin our construction of section 1997e(e) where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is the words of the statutory provision."). The majority initially tries to justify its holding with the clear language of the statute; this is why its spends so much time trying to answer the mind-numbing question of "whether 'bring' means to commence or start a lawsuit, or instead means to maintain or continue it to conclusion." Ante at 4-5. As we have already seen, however, the conclusion that "bring" means "commence" does nothing to buttress the court's holding. Under the majority's reading of the statute, it would not matter whether "bring" meant to

67

"commence," to "maintain," or to "immediately cease and desist." No matter what the word means, if a prisoner does it while confined, then the case must be dismissed, no questions asked. This is the ultimate conclusion that the majority must establish – that whatever section 1997e(e) prohibits, if a person who is confined in a jail, prison, or other correctional facility does it, then Congress intended that courts ignore Rule 15(d) and dismiss the case regardless of whether section 1997e(e) has ceased to apply in the individual's circumstances. The clear text cannot establish this conclusion because section 1997e(e) says nothing about overriding the existing and facially applicable Rules of Civil Procedure. Therefore, in an effort to find a leg to stand on, the "textualist" majority is forced to rely upon the legislative history to make an argument based upon congressional intent (and not the words that Congress actually enacted).[13]

---

[13] The absence of textual support (and the resort to congressional intent) becomes especially apparent when the majority attempts to distinguish Matthews and all the other cases I cite for the proposition that plaintiffs in the instant case should be allowed to supplement their complaint under Rule 15(d) of the Federal Rules of Civil Procedure. See ante at 28-30. The difference between all of those cases and the instant case, we are told, is that "in this case permitting the plaintiffs to proceed would undermine the statutory purpose of prohibiting these types of claims . . . ." Ante at 29. "Congressional intent" is a tricky thing. Ever since the Legal Realist movement of the early 20th Century, scholars have criticized the whole concept of a legislative "intent" or "purpose" as undiscoverable at best, and at worst, a facade used by activist judges that can be endlessly manipulated in the service of a judge's personal policy preferences. See, e.g., Max Radin, "Statutory Interpretation," 43 Harv. L. Rev. 863, 870-71 (1930) ("That the intention of the legislature is undiscoverable in any real sense is almost an immediate inference from a statement of the proposition. The chances that several hundred men each will have exactly the same determinate situations in mind as possible reductions of a given [statutory issue], are infinitesimally small . . . . Even if the contents of the minds of the legislature were uniform, we have no means of knowing that content except by the external utterances or

While its attempt to glean from the legislative history a congressional fixation on prisoner "filing" is laudable, the majority misses the mark here as well. In the first place, the "filing" argument is belied by the plain language of the statute, which states that "[n]o Federal <u>civil action</u> may be brought by a prisoner

---

behavior of these hundreds of men, and in almost every case the only external act is the extremely ambiguous one of acquiescence, which may be motivated in literally hundreds of ways . . . ."). Perhaps this is one reason why, in recent years, the federal courts have turned more and more to focus on the <u>text</u> of a statute, as opposed to the statutory <u>purpose</u> (often revealed in the legislative history). Though congressional intent (and legislative history) still have a legitimate place in the interpretive enterprise, this court has embraced the notion that we should always begin with the statutory text, and that where the congressional command is clear, we should follow the statute as enacted. <u>See</u> <u>United States v. Gilbert</u>, 198 F.3d 1293, 1298 (11th Cir. 1999) ("We begin our construction of the Hyde Amendment where courts should always begin the process of legislative interpretation, with the words of the statutory provision themselves."); <u>Kay v. Apfel</u>, 176 F.3d 1322, 1325 (11th Cir. 1999) ("We begin, as we must, with the statutory text itself."); <u>United States v. Pielago</u>, 135 F.3d 703, 712 (11th Cir. 1998) ("We begin, as always, with the text of the Sentencing Guidelines."); <u>Hunter v. United States</u>, 101 F.3d 1565, 1574 (11th Cir. 1996) ("We begin where courts interpreting statutory and rule provisions should, with the language of the provisions.").

In the instant case, it is clear that Congress did not abrogate Rule 15(d) when it enacted section 1997e(e). No such abrogation is mentioned in the statutory text. Therefore, under our normal mode of statutory interpretation, we would allow plaintiffs to supplement their complaint to notice the fact of their release, and continue their lawsuit against employees of the GDC. This result is certainly not "absurd," such that we might be entitled to reformulate the statute. <u>See</u> <u>Rector, Holy Trinity Church v. United States</u>, 143 U.S. 457, 12 S. Ct. 511, 36 L. Ed. 226 (1892). The result the majority reaches, requiring a court to dismiss and then open the plaintiffs' case anew when plaintiffs re-file their action, seems far more bizarre than simply allowing the suit to continue since section 1997e(e) no longer applies in the case. Because the text is clear, and the obvious result is not absurd, it is troubling that a court that has so adamantly embraced a textualist mode of statutory interpretation should now base its decision almost entirely on statutory "purpose." <u>See</u> <u>ante</u> at 29-30. The difference between the majority position and my own is not "crystalized in [my] proposition that a prisoner who files his claim in direct contravention of section 1997e(e) while he is incarcerated ought to be allowed to continue with that claim after release, because '[p]risoners who are released while their suit is still pending immediately begin to face the same opportunity costs of prosecuting their action as everyone else.'" <u>Ante</u> at 26. The fact that the majority thinks that this is the crucial difference only exposes the degree to which the majority has eschewed the text of section 1997e(e), and has gotten carried away by considerations of policy.

69

confined . . . ." 42 U.S.C. § 1997e(e) (emphasis added). Part III.D.1 of the panel opinion (now reinstated) held that this language only precludes prisoners from bringing <u>damages actions</u> for mental or emotional injury suffered while in custody, and does nothing to prevent prisoners from bringing actions for declaratory or injunctive relief. <u>See</u> <u>Harris</u>, 190 F.3d at 1287-89. If Congress had wanted to stamp out all prisoner filings, why leave the injunctive avenue of relief available? Under the statute, prisoners can still seek injunctive relief from ongoing mental or emotional injury; they are just precluded from seeking damages.

Moreover, the legislative history, itself, demonstrates that Congress' purpose in enacting section 1997e(e) was a bit more nuanced than stamping out prisoner "filings." The majority unwittingly stumbles upon this conclusion when it opines,

> [a]s the Seventh Circuit has explained, "Congress deemed prisoners to be pestiferous litigants because they have so much free time on their hands and there are few costs to filing suit." <u>Kerr v. Puckett</u>, 138 F.3d at 323. The distinction between current and former prisoners makes sense for that reason, and because "[o]pportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits." <u>Id.</u>; <u>see also</u> <u>Madrid v. Gomez</u>, 190 F.3d 990, 996 (9th Cir. 1999) ("[I]t is certainly conceivable that, because of significant potential gains and low opportunity costs, prisoners generally file a disproportionate number of frivolous suits as compared to the population as a whole."); <u>Tucker v. Branker</u>, 142 F.3d 1294, 1301 (D.C. Cir. 1998) (noting that "prisoners have a lower opportunity cost for their time than other indigent (and in all likelihood, non-indigent) litigants.").

Ante at 17-18.  As the majority indirectly recognizes, the real purpose of section 1997e(e) was not simply to end prisoner "filings," but to curtail what was viewed as the largely meritless litigation (money damages suits for mental or emotional injury) being pursued by a group of people (prisoners) who face uniquely low opportunity costs in pursuing such litigation.  The legislative history is replete with references to the idea that prisoners put an especially heavy burden on courts' civil dockets because they have little else to do other than think up ways to sue their jailors.  See, e.g., 141 Cong. Rec. S7524-26 (daily ed. May 25, 1995) (statements by Senators Dole and Kyl) (prisoners have a unique incentive to file frivolous lawsuits because litigation "has become a recreational activity for long-term residents of our prisons," because prisoners "have little to lose and everything to gain," and because frivolous complaints are "a means of gaining a short sabbatical to the nearest Federal courthouse") (citations and internal quotation marks omitted).  If Congress just wanted to cut down on court "filings," why focus on prisoners at all?  Congress could have focused its attention on any number of groups that were deemed to be especially litigious.  Instead, however, Congress chose to preclude the bringing of federal civil actions by prisoners because they constituted the group that was particularly well-positioned in the litigation arena.  Prisoners have more free time, and often easier access to legal resources than most

of the American population.  See Bounds v. Smith, 430 U.S. 817, 828, 97 S. Ct. 1491, 1498, 52 L. Ed. 2d 72 (1977) (holding "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law"); but see Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (holding that Bounds did not eliminate the requirement that an inmate allege actual injury that has resulted from a deprivation of adequate legal resources before he can gain standing to sue in federal court).  Because they often file as indigents, prisoners have less to lose and more to gain by bringing lawsuits than the average citizen.

This understanding of the legislative purpose contradicts the majority's holding that a court should dismiss a plaintiff's action under section 1997e(e) even if the plaintiff is no longer incarcerated.  As the Seventh Circuit has recognized, the "[o]pportunity costs of litigation rise following release, diminishing the need for special precautions against weak suits."   Kerr, 138 F.3d at 323.[14]  If the purpose

[14] Aside from the majority's bald assertion that "the Seventh Circuit would reach . . . the same [result as the majority reaches today,]" ante at 10 (thus invoking the "thin air" doctrine, see Carlisle v. United States, 517 U.S. 416, 429, 116 S. Ct. 1460, 1468, 134 L. Ed. 2d 613 (1996)), there is no indication that the Seventh Circuit would agree with the majority's holding today under the reasoning of Kerr.  In that case, Judge Easterbrook went on at some length about the need for courts to "implement the [statutory] language actually enacted." Kerr, 138 F.3d at 323. In response to the district court's argument that "common sense" necessitated that section

72

of the PLRA was to curtail frivolous <u>prisoner</u> litigation, then there is no reason to apply it to persons who are no longer prisoners under the meaning of the Act. Prisoners who are released while their suit is still pending immediately begin to face the same opportunity costs of prosecuting their action as everyone else. They no longer have the same free time or access to legal resources as they did while in custody. Treating former prisoners as if they were still prisoners by dismissing their complaints under section 1997e(e) not only contravenes the clear language of the statute, and Rule 15(d) of the Federal Rules of Civil Procedure, but it also fails to make any sense in light of the statutory purpose.

## C.

Because today's holding is contradicted by the clear language of the PLRA, ignores Rule 15(d) of the Federal Rules of Civil Procedure, departs radically from

---

1997e(e) bar the claims of former prisoners who had been released from custody, the court responded:

> "Common sense" is a treacherous guide to statutory interpretation. One person's "common sense" is another's <u>bete noire</u>. Statutes are compromises among legislators who may hold incompatible conceptions of the public weal. Some legislators opposed the PLRA outright; others wanted more sweeping restrictions on prisoners' litigation; the actual statute satisfied few completely. Instead of relying on "common sense", which is an invitation to treat the law as if one side or the other had its way, a court should implement the language actually enacted–provided the statute is not internally inconsistent or otherwise absurd.

<u>Id.</u> How this language could support the majority's contention that we should extend the PLRA to cover suits by former prisoners to whom the statute no longer applies, by reading the statute to preclude supplemental pleadings to notice the fact of the prisoners' release, escapes me.

all applicable case law, is unsupported by the legislative history, and makes no sense in light of the statutory purpose (thus exhausting all legitimate avenues of statutory construction), I can only conclude that the majority is dissatisfied with what Congress has done in enacting section 1997e(e). The real problem the majority has in this case is that former prisoners can file suits "for mental or emotional injury suffered while in custody without a prior showing of physical injury" on the day they are released from incarceration. It is difficult to argue that Congress wanted courts to enforce the PLRA with such vigor that they should ignore the normal rules of pleading, and disallow supplements indicating that a plaintiff has been released from custody, when what Congress actually did was to enact a statute that ceases to apply on the same day a prisoner is released. The two notions do not gel; the majority's "dog won't hunt." Reynolds v. Roberts, 207 F.3d 1288, __ (11th Cir. 2000).

The majority has therefore sought to enhance the PLRA with an interpretation that is not supported by the statutory text. Seizing on a few passages from the legislative history (none of which are even remotely related to the issue of supplemental pleadings), the majority has tried to "put some teeth" into the PLRA, ante at 12 (quoting Gay v. Texas Dept. of Corrections State Jail Div., 117 F.3d 240, 242 (5th Cir. 1997)), by levying one all-purpose sanction on any prisoner who

seeks to prosecute a claim for mental or emotional injury, even if the PLRA no longer applies in his case. Why this dissatisfaction with the statute that Congress actually enacted? The answer can be found in the majority's discussion of the number of prisoner filings, bemoaning the fact that "[l]ast year alone, there were 3,465 prisoner lawsuits filed in the district courts of this circuit." Ante at 20.[15] The PLRA may go some distance in reducing the volume of prisoner litigation, but the majority has decided that it does not go far enough. So, because Congress did not quite get it right, we will "help out the legislature" today by means of a judicial amendment that takes the unprecedented step of inferring a remedy for a violation of section 1997e(e) that can be found nowhere in the statute, and that was never mentioned during the legislative debates.

Congress could have done a lot of things when it enacted the PLRA. It could have provided for criminal penalties for a violation of section 1997e(e), or a civil fine to be imposed every time a prisoner files while incarcerated. It even could have rendered Rule 15(d) inapplicable in prisoner litigation, so that a

---

[15] I dislike frivolous prisoner litigation as much as my colleagues do. Suits that are truly meritless (such as Eighth Amendment claims that prisoners have a constitutional entitlement to chunky peanut butter, see 141 Cong. Rec. S14408-01, S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole)) impair the courts' judicial resources, and increase overall delay – at both the trial and appellate levels – in a circuit that is already extraordinarily burdened. Frustration with frivolous lawsuits, however, does not give us the authority to enact legislation to cure the problem. We are bound by Congress' enactments, and where Congress has spoken to the question of remedies, we may go no further.

75

prisoner would be precluded from supplementing his complaint to reflect the fact of his release.  We know that when Congress wanted to alter the Rules of Civil Procedure, as in section 1997e(c)(1) (court shall "on its own motion . . . dismiss any action . . . [that is] frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief"), it certainly knew how to do so.  Congress, however, provided for none of these remedies for a violation of section 1997e(e).  It simply provided that "[n]o Federal civil action may be brought."  Without congressional authorization, it is utterly inconceivable that the majority could infer from these words such a drastic remedy as dismissal, regardless of whether the statute actually applies.

In an effort to assist Congress in stamping out prisoner lawsuits, the majority has forgotten the one very basic, but fundamental truth that "there is no liberty if the power of judging be not separated from the legislative and executive powers." The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (quoting Montesquieu, The Spirit of the Laws, vol. I, p. 181).  Quite frankly, it is not our job to "put some teeth" into the PLRA, or any other statute that Congress enacts; our job is to follow the congressional command by enforcing the statute as written.  "Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvements."  Badaracco v. Commissioner, 464 U.S. 386,

76

398, 104 S. Ct. 756, 764, 78 L. Ed. 2d 549 (1984); see also Bount v. Rizzi, 400 U.S. 410, 419, 91 S. Ct. 423, 429, 27 L. Ed. 2d 498 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute."); Korman v. HBC Florida, Inc., 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes."); cf. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 865, 10 S. Ct. 2778, 2793, 81 L. Ed. 2d 694 (1984) ("Courts must, in some cases, reconcile competing political interests, but not on the basis of judges' personal policy preferences."); cf. also Chandler v. James, 180 F.3d 1254, 1275 (11th Cir. 1999) (Tjoflat, J., specially concurring) (discussing the separation of powers concerns that arise when courts use the injunctive remedy beyond what Congress has prescribed). The fact that the majority thinks that it is following Congress' purpose is no justification for encroaching upon the legislative domain by inferring remedies that cannot plausibly be drawn from the statutory language. When we blur the boundaries between the judicial and political branches, we threaten the supremacy of the legislature when it comes to the creation of law.

## III.

The immediate effects of today's decision are troubling. Despite the majority's desire to cut down on prisoner litigation, today's holding will simply

77

spawn needless litigation as the district courts in this circuit are forced to dismiss a prisoner's case without prejudice, and then reconsider the case without the physical injury component after the prisoner is released from custody. I appreciate the majority's candor in acknowledging that because "some . . . claims will be re-filed after the [prisoner] is released . . ., more total effort may well be required to adjudicate those particular claims than if [the majority's interpretation of] the section 1997e(e) bar did not exist." Ante at 22-23. I doubt, however, that the majority realizes the magnitude of the "total effort" that district courts will now have to invest in implementing today's decision. The issue of whether a prisoner can meet section 1997e(e)'s physical injury requirement may not be decided, in many cases, until summary judgment or at trial. Thus, a district court now faces the prospect of bringing its resources to bear on a prisoner's claim, only to conclude on motion for summary judgment or at trial that, since the prisoner suffered no physical injury, it must dismiss the case. The court's efforts will have gone for naught because its determination that there was no physical injury will be of no moment in the court's consideration of the former prisoner's claim, asserted in a new suit filed subsequent to his release, that he suffered mental or emotional injury while in custody.

Following, I set out Congress' purpose in enacting section 1997e(e). I then compare, in light of the congressional purpose, the practical effects of my interpretation of section 1997e(e), with the practical effects that will surely flow from the majority's interpretation.

## A.

As noted supra in Part II.B, the purpose of section 1997e(e) was not just to cut down on prisoner "filing." Such a myopic view of the statute misses the forest for only one tree. The purpose of the statute was to curtail what was viewed as the largely meritless litigation (money damages suits for mental or emotional injury) being pursued by a group of people (prisoners) who face uniquely low opportunity costs in pursuing such litigation. This broad understanding of the congressional design actually imputes two, interrelated motives to Congress. In enacting the PLRA, Congress sought to (1) conserve judicial resources, and (2) continue to allow prisoners to pursue meritorious litigation.

First, Congress sought to preserve judicial resources by enacting a series of measures that function as gate-keepers to the district courts.[16] Prior to the enactment of the PLRA, 28 U.S.C. § 1915(d) was the only gate-keeping

---

[16] In enacting the PLRA, Congress also sought to preserve state court resources. Because this case focuses on litigation in the federal courts, I tailor my remarks accordingly.

mechanism that district courts had at their disposal to screen out frivolous prisoner lawsuits. That section allowed a court to dismiss a case, <u>sua sponte</u>, if the court was "satisfied that the action [was] frivolous or malicious." 28 U.S.C. § 1915(d) (1994). Because Congress deemed section 1915(d) inadequate to safeguard judicial resources from the onslaught of prisoner lawsuits, it enacted several provisions of the PLRA to serve as heightened gate-keepers.

28 U.S.C. § 1915(b), for example, qualifies a prisoner's right to bring a civil action <u>in forma pauperis</u> by requiring partial payment of the filing fee up-front, and then monthly payments to cover the balance of the fee. This provision increases the costs of bringing a civil action for the prisoner, and thus makes it more likely that prisoners will only bring suits that have some merit. Certainly, section 1915(b) will decrease prisoner "filings." But why is that, in the view of Congress, a good thing? The answer, of course, is because fewer "filings" means <u>fewer judicial resources expended on prisoner lawsuits</u>. The ultimate goal is not just to decrease prisoner "filings;" <u>the goal is to save the judiciary the expenditure of time and resources</u>.

The same is true of section 1997e(e). The requirement that prisoners demonstrate physical injury serves as a gate-keeping mechanism by screening out a certain class of cases – cases in which a prisoner seeks damages for mental or

emotional injury only. This raises the bar on a prisoner who wants to bring a damages action while incarcerated, by forcing the prisoner to demonstrate an element (physical injury) that is not necessarily required to state a claim for relief under the Eighth Amendment.[17] Thus, the district courts' resources are preserved for cases in which a prisoner can demonstrate physical injury. A court is empowered to make an up-front determination of whether the prisoner has alleged injury sufficient to meet the section 1997e(e) requirement; if not, then the case can be disposed of without substantially taxing the court's resources.

The second purpose animating the PLRA is Congress' desire to continue to allow prisoners to pursue meritorious litigation. The legislative history is replete with examples of frivolous prisoner lawsuits that were so ridiculous that they would be humorous, but for the fact that they were constituting a serious drain on judicial resources. See, e.g., 141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("[P]risoners have filed lawsuits claiming such grievances as insufficient storage locker space, being prohibited from attending anniversary party, and yes, being served creamy peanut butter instead of the

---

[17] As Justice Blackman wrote in Hudson v. McMillian, "[i]t is not hard to imagine inflictions of psychological harm – without corresponding physical harm – that might prove to be cruel and unusual punishment." He cited as an example, "Wisniewski v. Kenard, 901 F.2d 1276, 1277 (CA5) (guard plaining revolver in inmate's mouth and threatening to blow prisoner's head off), cert. denied, 498 U.S. 926, 111 S. Ct. 309, 112 L. Ed. 2d 262 (1990)." Hudson v. McMillian, 503 U.S. 1, 16, 112 S. Ct. 995, 1004, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (Blackmun, J., concurring).

81

chunky variety they had ordered."); 141 Cong. Rec. S14408-01, S14418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch) ("In one frivolous case . . ., an inmate sued demanding that he be issued Reebok or L.A. Gear brand shoes instead of the Converse brand being issued. In another case, an inmate deliberately flooded his cell, then sued the officers who cleaned up the mess because they got his Pinochle cards wet."); 141 Cong. Rec. S14611-01, S14626 (daily ed. Sept. 29, 1995) (statement of Sen. Reid) (among "top 10 lawsuits in Nevada filed by prisoners," were claims that the prisoner should not be required to open his window slot when meals are served, that the delivery of mail interfered with prisoner's usual sleeping pattern, and that the prisoner was given a size five tennis shoe, when the actual size of his foot was four and three-fourths). It is this class of litigation, frivolous prisoner lawsuits, that Congress sought to screen out. Congress had no intent to prevent meritorious suits filed by prisoners from being adjudicated in the courts.

Section 1997e(e) perfectly illustrates the congressional desire to continue to allow prisoners to bring meritorious lawsuits. Congress could have eliminated all damages actions by plaintiffs confined in a jail, prison, or other correctional facility. This would certainly have been the most effective route if Congress' sole purpose in enacting the PLRA was to conserve judicial resources. But section 1997e(e) only affects actions brought solely for mental or emotional injury, and

does not impair a prisoner's right to bring an action for physical injury. Why the distinction? Obviously, Congress made a determination that suits brought solely for mental or emotional injury were more likely to be without merit than cases in which a prisoner sustains some physical injury.

This determination certainly comports with traditional legal principles; tort law, for example, is notorious for redressing the claims of those who have undergone a nonconsenual "touching," while virtually ignoring those who claim to have suffered some damage from "verbal harassment." Because Congress wanted to conserve judicial resources while still allowing prisoners to pursue meritorious litigation, it identified a certain class of cases as being particularly likely to be without merit – cases in which prisoners sued for mental or emotional injury only – and then screened off those cases as not deserving of judicial consideration.

B.

My interpretation of section 1997e(e) is faithful to the congressional purpose of conserving judicial resources while still allowing prisoners to pursue meritorious claims. Consider a case in which a prisoner alleges that prison guards physically abused him, and seeks damages for both the physical injury, and the mental or emotional distress that resulted. In one scenario, the case will move

along, the parties will engage in discovery, and the defendant will move for summary judgment, contending that the prisoner has failed to demonstrate physical injury and that the case should therefore be dismissed. Before the court rules on the defendant's motion, assume that the plaintiff is released from incarceration, and seeks to supplement his complaint to notice the fact of his release and to delete his allegation of physical injury.

If, as under my interpretation of section 1997e(e), the court has discretion to permit the supplement, then the court can adjudicate the plaintiff's claim for mental or emotional injury only. The section 1997e(e) bar will no longer apply, and the court can adjudicate the case in one proceeding. The judicial machinery will only be set in motion <u>one time</u> in order to dispose of the <u>whole case</u>.

Now consider a second scenario. It is entirely likely that many prisoners will be able to proffer enough evidence of physical injury to preclude the court from dismissing their claims for damages on motion for summary judgment. In that case, the issue of whether the prisoner suffered physical injury will go to <u>trial</u>. If a prisoner is released from incarceration during trial, then under my interpretation of section 1997e(e), the district judge will have discretion to allow the plaintiff to supplement his complaint, and to delete his allegation of physical injury. Because the court is able to exercise its discretion, the parties can litigate

the claim for mental or emotional injury to final judgment. Again, the section 1997e(e) bar will no longer apply, and the court will only have to oversee <u>one proceeding</u> in order to dispose of the <u>whole case</u>.

The key to understanding this interpretation of section 1997e(e) is to realize that the value of the statutory provision, in terms of conserving judicial resources, depends on <u>how quickly the district judge acts on a prisoner's complaint</u>, specifically, the prisoner's allegation of physical injury. If the district judge can determine from the pleading that the prisoner has failed to allege physical injury sufficient to withstand the section 1997e(e) bar, then the litigation has not cost very much in terms of judicial resources. It is true that the prisoner will be able to re-file his claim for mental or emotional injury once he is released, and thus subject the judiciary to two, almost identical lawsuits. But the costs of dismissing the suit while the prisoner was incarcerated were not very high; therefore, the sanction of forcing the prisoner to re-file the case once he is released has not come at a high cost to the judiciary.

The further along the case proceeds, the more it costs in terms of judicial resources, and the closer the date of the prisoner's release from custody. If the case reaches the summary judgment stage or goes to trial, then a substantial amount of judicial effort has been invested in determining whether the prisoner

suffered physical injury. If the prisoner is released from incarceration, and the court determines (either on summary judgment or at trial) that his evidence of physical injury is insufficient, the costs of dismissing the case, requiring the former prisoner to re-file it, and forcing the court to entertain the litigation all over again, impose a <u>very</u> high price on the judiciary. This is because once the case is re-filed, the court will have to address it anew. All of the court's work in determining whether the plaintiff suffered physical injury will have been for naught, because physical injury will no longer be an element of the plaintiff's claim. This seems like an exorbitantly high price to pay merely to extract a second filing fee from the plaintiff (who may not have to pay the filing fee after all, because he will likely be able to proceed <u>in forma pauperis</u>). Thus, the sensible solution, and the solution obviously intended by Congress when it fashioned section 1997e(e) not to abrogate Rule 15(d), is to allow released prisoners to supplement their complaints and continue their lawsuits.

## C.

Today's holding, on the other hand, requires a district court to engage in the administrative absurdity of dismissing a case no matter what stage the litigation has reached, and regardless of whether the plaintiff has been released from

incarceration, and then entertain the case anew when the former prisoner files his action again.[18]  In the first scenario discussed above (where plaintiff seeks to supplement his complaint to notice the fact of his release and withdraw his allegation of physical injury before summary judgment is entered), the court's holding today will mean that the district court will lack discretion to permit the supplement.  Thus, if the court resolves the issue of physical injury against the plaintiff – because it either treats the plaintiff's motion as a concession that the plaintiff cannot demonstrate physical injury, or grants partial summary judgment on the issue of physical injury – it will have to dismiss (without prejudice) the case under section 1997e(e).  The plaintiff will immediately re-file, seeking damages for mental or emotional injury only.  The court will then be forced to consider, in a second proceeding, the plaintiff's claim for mental or emotional injury, all because it had to dismiss the previous case under the court's holding today.  All the court's work in the previous case will have been for naught.

The even worse scenario, of course, is where the prisoner's case actually goes to trial.  If a court cannot grant the released prisoner's motion to supplement

_____

[18] As opposed to the majority's somewhat exotic hypothetical where a prisoner is confined, and then released, and then picked up again and jailed, and then bailed out, and then returned to prison, ante at 19, the spectacle of a court dismissing an action, just so it can entertain the action again when the former prisoner files his action anew is not hypothetical; it is the result of the majority opinion.

at trial, then the court faces the prospect of dismissing the case under section 1997e(e) (even though the plaintiff has been released from incarceration), and then adjudicating the case once again when the plaintiff re-files for mental or emotional injury. In this scenario, the court's holding today will force the district court to engage in a full-blown trial that will ultimately serve no purpose other than requiring the plaintiff to pay a second filing fee (in the event that he is ineligible for in forma pauperis status).

The majority's interpretation not only wastes judicial resources; it is also unfaithful to the second congressional purpose of continuing to allow prisoners to pursue meritorious lawsuits. If a prisoner is able to surmount the summary judgment hurdle – that is, convince a district judge that his claim for physical injury has enough evidentiary support to warrant a fact determination – then his case is meritorious by definition. Thus, by forcing district courts to dismiss a plaintiff's case whenever it becomes apparent that the plaintiff has suffered no physical injury (even if that determination is not made until trial), the court's holding punishes plaintiffs who did not violate section 1997e(e). It is at least arguable that if a plaintiff can get by summary judgment on the issue of physical injury, then he did not bring a case "for mental or emotional injury suffered while

in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).[19] It

therefore seems odd to punish a plaintiff (by dismissing his case and forcing him to

pay a second filing fee) after his release from incarceration, when the action, as

originally brought, was meritorious. The majority punishes a whole class of

plaintiffs (those who bring meritorious cases) who Congress never intended to

subject to punishment.

In addition to unduly taxing district court resources, the court also imposes a

burden on defendants to defend the action all over again when plaintiffs re-file.

After the defendant has already invested enormous amounts of time and money in

defending the lawsuit, why would the defendant ever want the court to dismiss the

---

[19] There are two ways that one could read section 1997e(e)'s proscription on bringing
suits for mental or emotional injury suffered while in custody without a prior showing of
physical injury. One could interpret the provision as precluding a prisoner from bringing all
damages actions in which the trier of fact does not ultimately find that the prisoner suffered
physical injury. Alternatively, one could read the statute as precluding only those lawsuits in
which the prisoner does not have enough evidence of physical injury to get past summary
judgment. It seems unlikely that Congress intended the first interpretation. The issue of whether
the prisoner intentionally violated section 1997e(e) would become irrelevant to the statutory
construction, because if the prisoner has enough evidence of physical injury to surpass the
summary judgment hurdle, he obviously did not intend to violate the statute when he filed his
suit. If a district court does not grant summary judgment to the defendant, then when the
prisoner brought the action, the case was meritorious enough to preclude a district judge from
throwing it out. Whether the prisoner's violation of section 1997e(e) was intentional, however,
must at least play some role in our interpretation; this is because, as discussed supra, in enacting
section 1997e(e) Congress only intended to screen out frivolous suits from the district courts'
dockets. The focus was on punishing those prisoners who repeatedly abuse the judicial process
by filing claims that are patently without merit. This does not mean that we should impose some
mens rea requirement on the functioning of section 1997e(e). But the issue of intent, as it relates
to whether a prisoner's case is so frivolous that he obviously knew he was violating section
1997e(e) when he brought the action, is relevant to determining whether a violation has actually
occurred.

case without resolving all of the plaintiff's claims? If the court dismisses the action, then the plaintiff will re-file, and the defendant will have to defend a second time. Because a defendant will most likely want the court to address the plaintiff's whole case (including the plaintiff's claim for mental or emotional injury only) in one proceeding, the defendant may request the court to grant the plaintiff's motion to supplement and carry the case to final judgment. If the court granted the defendant's request, its ruling would be insulated from appellate review under the invited error doctrine.

The majority's sole justification for imposing on the district courts' scarce resources is that a prisoner who violates section 1997e(e) must be made to suffer some "burden, inconvenience, or expense," ante at 32. The sum total of this "burden, inconvenience, or expense" comes down to this: the former prisoner will have to pay a second filing fee when he re-files his claims for mental or emotional injury. There are two reasons why the majority's "burden, inconvenience, or expense" may be no burden at all.

First, because the PLRA will no longer apply, it is likely that many former prisoners will not have to pay a second filing fee, because they will be entitled to file in forma pauperis under 28 U.S.C. § 1915(a)(1). Second, even if they do have to pay the fee, this punishment will have been extracted at a disproportionate cost

90

to the judiciary, and the defendant.  As discussed above, if the district judge is forced to dismiss the case at summary judgment or trial (even though the plaintiff has been released from incarceration, and thus relieved of the burden of demonstrating physical injury), then all the time and resources invested by the court and the defendant will have been wasted.  When one compares the cost of a second filing fee to the plaintiff with the costs today's decision imposes upon the judicial system, one wonders exactly who the majority seeks to punish in this case.

IV.

For the foregoing reasons, I dissent from the court's holding that section 1997e(e) of the PLRA required the district court to dismiss plaintiffs' complaint, even though that section no longer applies to plaintiffs because they are no longer prisoners within the meaning of the Act.  I would reinstate fully the panel opinion in this case, vacating the district court's dismissal of claims for compensatory and punitive damages for plaintiffs Chadwick, Harris, Cook, Hooks, Nation, and Dailey, and remanding the case to the district court for further proceedings.

I concur in the court's judgment insofar as it reinstates those parts of the panel opinion that dispose of the claims of plaintiffs Locklear, Kilgore, Langes, Brinkley, and Wade.